**Linda H. KEZIAH, Plaintiff–Appellant,**

**v.**

**W.M. BROWN & SON, INCORPORAT-ED, a Virginia Corporation, Defendant–Appellee.**

No. 88–3169.

United States Court of Appeals, Fourth Circuit.

Argued March 8, 1989.

Decided Aug. 28, 1989.

323

Joyce Murphy Brooks, Charlotte, N.C., for plaintiff-appellant.

Scott Sanford Cairns (Thomas G. Hardy, III, McGuire, Woods, Battle & Boothe, Richmond, Va., D. Blaine Sanders, Robinson, Bradshaw & Hinson, P.A., Charlotte, N.C., on brief), for defendant-appellee.

Before ERVIN, Chief Judge, WILKINS, Circuit Judge, and WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.

ERVIN, Chief Judge:

Linda Keziah appeals from the district court's grant of summary judgment against her on the Equal Pay Act,[1] intentional infliction of emotional distress, and negligent supervision claims she brought against her former employer, W.M. Brown & Son, 683 F.Supp. 542. We find that appellant established a prima facie case under the Equal Pay Act, and that the appellee failed to rebut that case. We, therefore, reverse the grant of summary judgment in favor of Brown on that issue, and remand this part of the case for trial. We affirm, however, the grant of summary judgment on the pendent state law claims, as the conduct giving rise to these claims does not meet the level of outrageousness required by North Carolina law.

I.

Defendant–Appellee, W.M. Brown & Son, offers color lithographic printing services throughout the southeastern United States.

1. 29 U.S.C. § 206(d)(1).

Its printing facility is in Richmond, Virginia, where the majority of its approximately 200 employees are located. Appellee has a small sales office in Charlotte, North Carolina, staffed by "outside" sales representatives.

Brown hired the appellant, Linda Keziah, in August, 1984 as a sales representative for the Charlotte office. At that time the Charlotte office had two other employees: Michael Dohn, who was hired in June, 1983 as an outside sales representative, and Edward Jones, the Regional Sales Manager, who supervised the Charlotte office and performed some sales duties as well.

Prior to working for W.M. Brown, Ms. Keziah had worked as a sales representative for another printing company, Graphic South. She had worked there approximately one and a half years, during which she earned $25,000 per year. She left Graphic South for Brown because she felt it was a "more quality" company which would be easier to sell. Ms. Keziah testified that she initially had been concerned that she would be unable to persuade Graphic South customers to buy the more expensive product offered by Brown.

W.M. Brown compensated its sales representatives with a nine percent commission on "regular" accounts and a ten percent commission on "new" accounts. Ostensibly because Brown anticipated that the first two years of a salesperson's tenure would be difficult, the company paid each salesperson a "draw," allegedly based on the salesperson's experience and projected sales. Dohn's yearly draw was $32,500; Keziah's was $22,000. Although Brown claimed that each salesperson was expected to earn sales commissions at least equaling his or her draw, the evidence demonstrated that from 1984 to 1987 neither Keziah nor Dohn achieved this goal. Keziah testified that Brown told her that she would be expected to earn commissions to cover her draw, but she was never given a deadline for doing so.

Keziah further testified that there was tension in the Charlotte office throughout the time she worked there. She believed that Dohn was stealing her accounts and

that her supervisor, although aware of Dohn's conduct, did nothing to stop it. She claims that when she complained of Dohn's tactics, several of her accounts were given to him. The evidence demonstrates that many accounts were "switched" between Dohn and Keziah.

Brown fired Ms. Keziah on April 1, 1987, allegedly as a result of her poor job performance. Keziah claims that her termination resulted from, and is evidence of, gender-based discrimination.

Following her termination, Ms. Keziah filed the current action in the United States District Court for the Western District of North Carolina. She seeks damages under the Equal Pay Act, Title VII, and state law tort theories. The district court granted summary judgment against Ms. Keziah on her Equal Pay Act, Title VII sexual harassment, and intentional infliction of emotional distress/negligent supervision claims, while allowing her action for Title VII disparate treatment. Ms. Keziah then voluntarily dismissed, with prejudice, her Title VII disparate treatment claim, and she now appeals the grant of summary judgment only on her Equal Pay Act and her state law claims.

## II.

### Equal Pay Act Claims

■ To establish a *prima facie* violation of the Equal Pay Act, a female plaintiff must demonstrate (1) that she is receiving lower wages than a male co-worker (2) for equal work requiring equal skill, effort, and responsibility. 29 U.S.C. § 206(d)(1) (1982); *see Brewster v. Barnes*, 788 F.2d 985, 991 (4th Cir.1986). Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to prove by a preponderance of the evidence that the wage differential resulted from (1) a seniority system, (2) a merit system, (3) a system pegging earnings to quality or quantity of production, or (4) "any factor other than sex." 29 U.S.C. § 206(d)(1); *Barnes, supra*, 788 F.2d at 991.

The district court found that Keziah and Dohn performed the exact same job—sell-

ing the company's services to various customers. The record fully supports this conclusion.

■ Brown argues that there exists no salary differential between Keziah and Dohn, because the two employees worked for commissions, not salaries, and they were paid the exact same commission rate. The company alleges that the $22,000 and $32,500, paid to Keziah and Dohn respectively represented "draws" or "advances against commissions." Dohn's draw was higher because, with his alleged experience in the field, he was expected to sell more than Keziah, and thus earn more in commissions.

As the district court noted, "[Brown's] argument has initial appeal, until the actual sales made by the two are compared." The draws were paid regardless of the actual commissions earned and, although neither Keziah nor Dohn ever earned commissions equal to their draws, those draws were not reduced, nor were excess draws carried forward as deficits. Additionally, Brown's own records referred to those annual payments as "base salary" or "guaranteed pay." Given this evidence the trial court correctly concluded that the draws were in fact "base salaries." Keziah, therefore, was paid a lower wage for performing the exact same job as Dohn, and she established a *prima facie* violation of the Equal Pay Act.

■ Once a plaintiff presents a *prima facie* case, the defendant has the burden of showing, by a preponderance of the evidence, that the pay differential was based on one of the four statutory exceptions. *EEOC v. Whitin Machine Works, Inc.*, 635 F.2d 1095, 1097 (4th Cir.1980). The employer's burden is heavy, and the exceptions must be narrowly construed. *Id.* at 1098. The trial court found that Brown had rebutted Ms. Keziah's *prima facie* case by demonstrating that the salary differential was based on Dohn's "experience and customer base." Judge Potter based his conclusion on evidence of: (1) Dohn's "ten years of experience in the printing and paper industry," mostly in outside sales and marketing; (2) Dohn's extensive contacts in the Charlotte area, and the fact that he was "well known" in the community; and (3) Dohn's past-presidency of the Charlotte Society of Communicating Arts, "which position added to his reputation."

We find, however, that the record, when reviewed as a whole, demonstrates the company's failure to prove that the salary differential resulted from "any factor other than sex." While we are aware of this court's holding that differences in experience, training, or ability of workers may justify differences in their salaries, *EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 725 (4th Cir.1980), we find that the evidence presented below creates a genuine question concerning whether there in fact exists an "experience differential" between Keziah and Dohn.

First, Ms. Keziah also had ten years of experience in the "printing industry" at the time Brown hired her. Arguably, this prior experience was as related to her position at W.R. Brown as Dohn's prior experience in the industry. Additionally, Keziah testified that (1) Dohn told the company during pre-employment interviews that he had no printing company experience and that he had limited sales experience, (2) Dohn in fact did not have ten years of sales experience in the printing and paper industry, and (3) Dohn, but not Keziah, was required to take a two-week training course at Brown's Virginia headquarters to learn printing procedures and terminology.

It appears that the district court disregarded this testimony, largely because it came from Keziah herself, but also because she offered little "hard evidence" to support her assertions. Given the objective evidence in the record indicating that Dohn perhaps did not have as much experience as Brown claimed, the trial court erred in not giving more weight to Keziah's testimony. By ignoring Keziah's testimony completely, Judge Potter both made a credibility decision that should have been left to the jury, and also failed to view the evidence in the light most favorable to the plaintiff.

Furthermore, the record reveals that the company's defense rests not so much on

Dohn's allegedly superior qualifications as it does on Brown's claim that, for whatever reason, Dohn was going to be able to sell more and was therefore worth more. Yet this assertion is seriously undermined by the company's own records which reveal that Brown projected identical sales goals for Keziah and Dohn the first two years they worked together. The records also show that in the third year of employment Keziah was actually assigned a *higher* sales goal than Dohn. While the company is telling us that they expected Dohn to sell more than Keziah, their records tell us otherwise.

■ Keziah also argues that much of the evidence presented by Brown concerning its motives in setting salaries is "incompetent." Both Dohn and Keziah's salaries were set by Ed Jones, the former supervisor of the Charlotte office. Jones was a close personal friend of Dohn's. Instead of offering the testimony of Jones, however, the company offered interrogatory answers signed by its Executive Vice President and General Manager, Thomas Latham, to explain why Jones made these salary decisions. Ms. Keziah asserts that the district court erred in relying on these interrogatory answers to conclude that Jones based the salary differential on Dohn's experience and customer base, because those answers constitute incompetent evidence. This alleged incompetence results from Latham's lack of personal knowledge of, or involvement in, the setting of the salaries. The lack of firsthand knowledge, Keziah claims, meant that "Latham could not competently testify as to what Mr. Jones knew, believed, or considered when Jones negotiated with Keziah and Dohn."

Under Fed.R.Civ.P. 56, the district court was free to consider the answers to interrogatories in determining whether summary judgment was proper. Those answers, however, fail to explain satisfactorily the problems concerning the salary differential. One of the things undermining the company's defense is the pure subjectivity of the salary-setting process. The salaries were based on nothing more than Jones' subjective evaluation of the individual worth of Keziah and Dohn. The company failed to show the existence or application of any salary guidelines or concrete standards for determining salary. Nor did Brown explain why $10,500 was a reasonable salary difference in this particular case. The pure subjectivity of the process, combined with the lack of Jones' testimony explaining his evaluations, and the fact that the company set for Keziah sales goals as high or higher than Dohn's, means that the company failed to prove that the salary differential was based on a factor other than sex.

### III.

### *Pendent State Claims*

Ms. Keziah also claims damages for the intentional infliction of emotional distress and Brown's negligent supervision of its employees.

### A.

### *Intentional Infliction of Emotional Distress*

■ Keziah's emotional distress allegedly resulted from the following occurrences:

(1) having her telephone messages secretly withheld and used by male sales representatives to usurp her prospective sales opportunities;

(2) having information secretly retrieved from her business files and her mail;

(3) having her sales orders and requests for quotes unnecessarily delayed and/or denied;

(4) having her customer accounts arbitrarily transferred to male sales representatives;

(5) having higher "mark ups" set for her customers than those set for the customers of male sales reps; and

(6) being harassed, humiliated and otherwise subjected to an adverse employment environment.

The elements of an intentional infliction of emotional distress claim in North Carolina are: (1) extreme and outrageous con-

duct; (2) intent; (3) causation; and (4) severe emotional distress. *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325, 332 (1981). Conduct has been deemed sufficiently outrageous to give rise to liability "only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Hogan v. Forsyth Country Club*, 79 N.C.App. 483, 340 S.E.2d 116, 123 (1986).

The incidents in this case do not appear to rise to the required level of intolerability. For example, in *Hogan* the North Carolina Court of Appeals affirmed a grant of summary judgment in favor of the defendant with respect to two out of three plaintiffs. One of these unsuccessful plaintiffs demonstrated that her supervisor "screamed and shouted at her, called her names, interfered with her supervision of waitresses under her charge and on one occasion threw menus at her." 340 S.E.2d at 122. Additionally, when the general manager attempted to discuss the situation with the employees, the supervisor walked out. The second unsuccessful plaintiff presented evidence that her supervisor refused to grant her a pregnancy leave of absence, ordered her to carry heavy objects despite her pregnancy, and refused to grant her permission to leave work to go to the hospital. When she went to the hospital anyway, the supervisor fired her.

Additionally, it does not appear that the events in this case caused Keziah "severe emotional distress." In her deposition she testified that she suffered no physical ailment related to emotional distress, and her distress resulted primarily from the frustration of "work[ing] real hard on something and you're told to go and get it, and you come back and the door shuts."

### B.
#### Negligent Supervision

North Carolina recognizes "a claim against an employer for negligence in employing or retaining an employee whose wrongful conduct injures another." *Hogan, supra*, 340 S.E.2d at 123. To establish liability on such a claim the "plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the incompetency." *Id.* at 124. The allegations of Keziah's complaint demonstrate that she seeks to prove the intentional infliction of emotional distress claim as the tortious conduct underlying her negligent supervision claim. Because summary judgment was properly granted on her emotional distress claim, however, the negligent supervision claim must also fail. *See Hogan, supra* at 124–25 (holding that because plaintiffs' intentional infliction of emotional distress claims could not survive summary judgment, they could not maintain a negligent supervision action based on that conduct).

### IV.
#### Conclusion

For the reasons set forth herein, we reverse the grant of summary judgment on' Keziah's Equal Pay Act claim, and remand that claim for a trial on the merits. We affirm the grant of summary judgment on her state law tort claims.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.