## Sara HASSMAN

### v.

## VALLEY MOTORS, INCORPORATED.

### Civ. No. N89–101.

United States District Court,
D. Maryland.

April 24, 1992.

---

James E. Gray, Linda S. Woolf, Baltimore, Md., for plaintiff.

Marcy M. Hallock, Douglas W. Desmarais, Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, Senior District Judge.

In this case, brought pursuant to the Equal Pay Act and Title VII, Sara Hassman claims that over a period of two years, from July 1985 to July 1987, her employer, Defendant Valley Motors, Inc. ("Valley") paid her male co-workers substantially more than they paid her, for equal work. Defendant states that Plaintiff was employed as an assistant to her two male co-workers, that the male co-workers performed duties that required greater skill and responsibility, and that the male co-workers were significantly more experienced and qualified than Plaintiff. Jurisdiction and venue are proper. 28 U.S.C. §§ 1331, and 1391.

Defendant is an automobile dealer, located in Cockeysville, Maryland, that sells, leases and services new and used luxury vehicles such as Mercedes Benz, Porsch

and Audi. It is owned by Charles Fenwick, Sr. and Charles Fenwick, Jr. (Defendant's president and general manager). Joseph Cameron is Defendant's General Sales Manager, responsible for, among other things, making personnel decisions.

In May of 1985, Defendant placed the following ad in the help wanted section of the *Baltimore Sun:*

> We are looking for an experienced finance and insurance manager for a newly created #2 spot, Applicant must be career-oriented with good references. Opportunity for advancement very good....

Plaintiff did not see this ad, but in June, 1985, she applied to Defendant, for a position as a Finance and Insurance Manager. Her credentials included a bachelor's degree in economics and a law degree. In addition to her academic credentials, Plaintiff had completed a one month program in dealership management at the General Motors Institute, and had obtained experience by working summers and part-time at her father's agency (Penn Pontiac Isuzu, Inc.). However, the Manager of Finance and Insurance at Penn Pontiac testified that Plaintiff had no training in that department, and that her resumé contained inaccuracies.

When Plaintiff began work at Valley in July, 1985 as a "Business and Lease Manager," the Finance and Insurance Department was run by one Charles Frederick, "Business Manager." Frederick joined Defendant in March, 1983, with six years of experience in Auto–Dealership Sales and Business Management. From March, 1983 to July, 1985, Frederick was the sole employee of the Finance and Insurance Department. His responsibilities included selling "finance and lease plans" to banks, "rehashing" deals that were declined, and "spotting" vehicles to Defendant's customers.[1] Frederick attended managers' meetings for the purpose of setting departmental goals, and was accountable to Fenwick and Cameron if the Department failed to perform as expected. Plaintiff shared responsibility for selling finance and lease plans, and rehashed deals with the various lending institutions. By her own admission, Plaintiff's spot decisions required approval by the General Sales Manager, Joe Cameron.[2] Cameron arranged his work schedule to coincide with Plaintiff's schedule so there would always be someone with authority to approve spotting decisions and to make certain other decisions.

Frederick left Valley in April, 1986. While Valley sought his successor, Plaintiff ran the F & I department for one month. During the time that Frederick and Plaintiff worked together, F & I employees were paid a percentage of gross profits on F & I income. At the end of April, Defendant agreed to an increase in Plaintiff's percentage of gross profit to reflect her performance during that month.[3]

---

**1.** "Rehashing" is the process of re-negotiating a "finance package" that has been turned down by a bank. Usually, the F & I Business Manager will determine, based on the dealership's relationship with the bank and the ratio of creditworthy versus uncreditworthy deals sold to the bank, whether to re-approach the bank or try elsewhere. The Business Manager will then try to increase the amount of "equity in the deal", adjust the interest rate, or provide additional information about the customer to justify the application.

"Spotting" is an industry wide term used to describe the practice of delivering a car to a customer 'on the spot', before the customer has obtained financing. Delivering the car on the spot, takes the customer out of the market. The practice can be quite risky for obvious reasons—should financing fall through, the vehicle must be recovered, and, if recovered, it will be substantially diminished in value.

**2.** Plaintiff claims that Cameron would approve her spot recommendations as a matter of course.

**3.** Before Hassman's arrival at Valley Motors, Frederick earned 10% of gross profit, a base salary of $275 per week, and the use of a demonstrator. When Hassman joined Valley, Frederick's percentage of gross dropped to 8.5%, and Hassman's was set at 3.5%. Frederick continued to receive a base salary of $275 per week, and the use of a demonstrator, and Hassman received a base salary of $200 per week and a $150 monthly car allowance.

For the month of April, Hassman negotiated her percentage of gross profit to 9.5%. When Clark Hutson joined Valley, Hassman's salary dropped to 5–5.75% of gross, and Hutson's pay was set at 11.5–13% of gross profit for the department. Hutson was granted the use of a demonstrator, while Hassman continued to receive a $150 monthly car allowance.

On April 20, 1987, Defendant placed an ad for the spot left open by Frederick:

Finance and Insurance Manager Needed: Must be experienced. We are looking for a very talented and professional manager to fill recent opening. Good benefits, demo, exc. working cond. [T]his is a 1st manager position. Call for appt. Joseph Cameron.

Joe Cameron testified that he considered Plaintiff for the "1st manager" position, and discussed this with Fenwick, but decided that she was not qualified. The position was eventually filled by L. Clark Hutson.

Hutson was recommended to the dealership by an executive at Loyola Federal Savings and Loan Association, and was well known and well regarded in the banking community.[4] He came to Valley after eleven years in dealership Finance and Insurance management. Hutson was offered a compensation package that exceeded that of his predecessor Frederick. Like Frederick, Hutson participated in department meetings, set departmental goals, and was accountable to the dealership for the department's performance.

Plaintiff left the dealership in July 1987 over a dispute concerning "chargebacks." In January, 1989, Plaintiff filed the current action alleging wage discrimination on the basis of sex.

## DISCUSSION

### A. *The Equal Pay Act*

■ A *prima facie* case under the Equal Pay Act ("EPA") requires proof (1) that an employer is paying different wages to employees, (2) of the opposite sex, (3) for equal work. 29 U.S.C. § 206(d)(1). If these elements are established, the burden shifts to the employer to prove that the differential in wages is justified under one of four affirmative defenses: (1) a seniority system, (2) a merit system, (3) a system pegging earnings to quality or quantity of production, or (4) any factor other than sex. 29 U.S.C. § 206(d)(1)(i)–(iv). *See, Keziah v.*

*W.M. Brown & Son, Inc.* 888 F.2d 322, 324 (4th Cir.1989); *Brewster v. Barnes*, 788 F.2d 985, 991 (4th Cir.1986). If a defendant is unable to establish a defense, then it is liable, and no "discriminatory intent" need be shown. *See, Patkus v. Sangamon–Cass Consortium*, 769 F.2d 1251 n. 5 (7th Cir.1985) (holding that the EPA creates a type of "strict liability.")

In drafting the statute, Congress intended that the reasonable business decisions of a corporation should be permitted to stand. *See, Hodgson v. Robert Hall Clothes, Inc.*, 473 F.2d 589 (3rd Cir.), *cert. den. sub nom. Brennan v. Robert Hall Clothes, Inc.* 414 U.S. 866, 94 S.Ct. 50, 38 L.Ed.2d 85 (1973); *Kouba v. Allstate Insurance Company*, 691 F.2d 873 (9th Cir.1982). The statute permits a defendant to show that a wage disparity resulted from a "factor other than sex." This defense protects the employer's judgment and avoids unnecessary disruption of *bona fide* job evaluation systems. *See, County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); and *Fallon v. Illinois*, 882 F.2d 1206 (7th. Cir.1989).

■ The touchstone of the equal work analysis is whether the work is "substantially equal." *Brewster v. Barnes, supra*, 788 F.2d at 991; and *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282, 291 (4th Cir.1974) *cert. den.*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975). *Accord, Hein v. Oregon College of Education*, 718 F.2d 910 (9th Cir.1983); *EEOC v. Universal Underwriters Insurance Company*, 653 F.2d 1243 (8th Cir.1981). If the jobs to be compared have a "common core" of tasks, i.e., significant portions of the two jobs are identical, the inquiry turns on whether the differing or additional tasks require greater skill or responsibility. *Barnes, supra*, 788 F.2d at 991 *Brennan v. Prince William Hospital Corp.*, 503 F.2d at 291. *See also*, 29 C.F.R. § 1620.15(a) (1991). Skill is a function of experience, training, education, and ability, and is measured in terms of the "performance re-

---

**4.** Bank executives from First National Bank, and Sparks Bank testified that they were familiar with Hutson through Town and Country Pontiac. The representative from Sparks Bank testified that when Hutson moved to Valley, it resumed doing business with the dealership.

quirements" of the job. *Id.* Responsibility measures, among other things, the degree of "accountability" to higher-ups. *See,* 29 C.F.R. 1620.17(a) (1991).

■ Plaintiff claims that she and her male co-workers shared responsibility for selling finance and lease plans, rehashing deals, and spotting vehicles to Valley customers. In addition to these shared responsibilities, Plaintiff contends that she and her male co-workers held the title "business manager" and were introduced to customers and lending institutions by that title.

The evidence shows that while Plaintiff and her co-workers generally shared responsibility for selling finance and lease plans and rehashing deals, she was not permitted to spot vehicles without the prior approval of the General Sales Manager. Her co-workers were responsible for setting departmental goals, and were accountable to the General Sales Manager and to Fenwick for the department's performance. Evidence of similar "titles" or "job descriptions" is important, *see e.g., Brock v. Georgia Southwestern College,* 765 F.2d 1026 (11th Cir.1985), but does not end the inquiry. While Plaintiff was called a "business manager," the Court focuses on the "actual duties" performed by each employee as part of the job. *Brewster v. Barnes, supra.*

Defendant alleges that Plaintiff was hired as an assistant to both of her male counterparts, that her co-workers performed duties requiring greater skill and responsibility, and that her co-workers were significantly more experienced and qualified. The evidence supports these conclusions. Just before Plaintiff was hired, Valley advertised for an F & I Business Manager to fill a "newly created # 2 spot." Plaintiff was hired to fill this spot. In contrast, when Frederick left the dealership, Valley again advertised, but this time for an F & I Business Manager to fill a recent opening in a "1st manager position."

Plaintiff's co-workers attended managers' meetings, set departmental goals, and were authorized to make "spot" decisions. Plaintiff was not authorized to spot, did not participate in setting departmental goals, and rarely attended management meetings. Finally, and most significantly, Frederick and Hutson were seasoned business managers, with six and eleven years, respectively, of experience in Finance and Insurance management. *EEOC v. Aetna Ins. Co.,* 616 F.2d 719, 725 (4th Cir.1980) (holding that differences in experience training, or ability of workers may justify differences in their salaries.) Plaintiff had no formal experience in the area of Finance and Insurance. Her resumé indicates that prior to her employment with Valley, she "handled financing arrangements," operated financing software, and "negotiated [ ] financing arrangements with lending institutions for both leasing and retail contracts," at Penn Pontiac. The significance of this experience is questionable in light of Plaintiff's prior inconsistent statement in an unrelated case. At a deposition, Plaintiff was asked if she had ever dealt with customers who financed purchases of automobiles at Penn Pontiac. Plaintiff responded:

> "Like I told you at the last deposition, I was not the finance person. I substituted on the nights that the finance manager was off and on some Saturdays that he was off. And, ... he basically had everything arranged for me and I would come in and just print up the contract.... I knew how to work the computer.

Defendant has articulated a legitimate, non-pretextual reason for the salary differential between Plaintiff and her male co-workers. Plaintiff's claim under the EPA is without merit.

### B. *Title VII*

■ The sex discrimination provisions of Title VII and the EPA are construed in harmony. *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir.1989); and *Brewster v. Barnes, supra.* *See,* 42 U.S.C. 2000e–2(a)(1) (1974). The same three elements of a *prima facie* case must be established, and the same four affirmative defenses are applicable. *See,* 42 U.S.C. § 2000e–2(h) (1974). *See e.g. Maxwell v.*

*Tucson,* 803 F.2d 444, 446 (9th Cir.1986). Whereas the EPA creates a sort of "strict liability" for discrimination on the basis of sex, Title VII requires a showing of some sort of "discriminatory intent." *Barnes, supra,* 788 F.2d at 993 n. 13.

■ In a Title VII case, once a defendant has established a legitimate non-discriminatory reason for the wage differential, the plaintiff must show by a preponderance of the evidence that the proffered excuse is pre-textual. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir.1989). For the reasons discussed above, Plaintiff has failed to meet this burden. Plaintiff's Title VII claim is without merit.

C. *The Maryland Equal Pay for Equal Work Act*

Plaintiff raises a claim under the Maryland State Equal Pay for Equal Work Act, codified at Art. 100 § 55A (Md.Code) (1957). Section § 55A provides:

No employer shall discriminate in any way by paying wages or salaries in any occupation to employees of one sex at a rate less than that paid employees of the opposite sex for work of comparable character or work on the same operations, business or type of work in the same establishment.

For the reasons stated above, this claim is without merit.

After due consideration of the testimony, the exhibits and the arguments, the findings herein are made in accordance with Fed.R.Civ.P. 52, whether or not so specifically identified.