977 F.2d 572
 15 O.S.H. Cas. (BNA) 1933
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Vera M. ENGLISH, Plaintiff-Appellant,
v.
GENERAL ELECTRIC COMPANY, Defendant-Appellee.
 No. 92-1018.
 United States Court of Appeals, Fourth Circuit.
 Argued May 7, 1992.
Decided Sept. 28, 1992.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington, No. CA-87-31-7-CIV; Franklin T. Dupree, Jr., Senior District Judge.
 Argued: M. Travis Payne, Edelstein & Payne, Raleigh, N.C., for appellant; Peter G. Nash, Ogletree, Deakins, Nash, Smoak & Stewart, Washington, D.C., for appellee.
 On Brief: Dixie L. Atwater, Ogletree, Deakins, Nash, Smoak & Stewart, Washington, D.C., A. Bruce Clark, C. Matthew Keen, Ogletree, Deakins, Nash, Smoak & Stewart, Raleigh, N.C., for appellee.
 E.D.N.C., 765 F.Supp. 293
 AFFIRMED.
 Before K.K. HALL and LUTTIG, Circuit Judges, and JAMES H. MICHAEL, Jr., United States District Judge for the Western District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 From 1972 until 1984, Vera M. English was employed by General Electric Company ("GE") as a laboratory technician in the Chemical-Metallurgical Laboratory ("Chemet Lab" or "Lab") at GE's nuclear fuel production facility in Wilmington, North Carolina. In late 1983 and early 1984, English complained to GE about what she believed to be safety and quality control problems at the facility. When GE did not take corrective action to her satisfaction, English deliberately failed to clean up radioactive contamination at her work station in an effort to prove that such contamination was not being detected by the facility's safety inspectors. On March 16, 1984, in response to English's deliberate failure to clean up the contamination, GE removed her from her laboratory technician position, barred her from "controlled access" areas of the facility, and reassigned her to a temporary position in another part of the facility. English was discharged by GE at the end of July 1984, after other "suitable work" at the facility was not found for her.
 
 
 2
 On March 13, 1987, English initiated this diversity action against GE. English originally asserted claims under two theories: a claim for intentional infliction of emotional distress and a claim for wrongful discharge. The district court held that both claims were preempted by Section 210 of the Energy Reorganization Act, 42 U.S.C. § 5851, and, in addition, that the wrongful discharge claim failed to state a claim under North Carolina law. See 683 F.Supp. 1006 (E.D.N.C.1988).
 
 
 3
 English appealed the dismissal of her emotional distress claim, but did not appeal the dismissal of her wrongful discharge claim. This court affirmed, see 871 F.2d 22 (4th Cir.1989), but the Supreme Court reversed and remanded, holding that the emotional distress claim was not federally preempted, see 496 U.S. 72 (1990).
 
 
 4
 Upon remand, English filed a motion to amend her complaint to add a new claim under a theory of bad faith discharge. By order entered May 7, 1991, the district court denied that motion on the grounds that North Carolina did not recognize a separate and distinct claim for bad faith discharge and that, since English had not appealed the dismissal of her wrongful discharge claim, she could not now assert a bad faith discharge claim. See 765 F.Supp. 293 (E.D.N.C.1991). The district court's denial of the motion to amend is English's first assignment of error.
 
 
 5
 English also filed a motion to compel GE to respond to certain discovery. After the motion was filed, the parties resolved all discovery issues except three document requests. Then, by order entered June 21, 1991, the district court denied English's motion to compel with respect to the three contested requests on grounds that (1) the requested documents "were not reasonably calculated to lead to the discovery of evidence relevant to a claim for intentional infliction of emotional distress," (2) "federal law would prohibit disclosure of some of the documents," and (3) "compliance with the requested discovery would be unfairly burdensome to defendant." The district court's denial of the motion to compel is English's second assignment of error.
 
 
 6
 Lastly, GE filed a motion for summary judgment as to all issues. On October 23, 1991, the district court granted GE's motion on the ground that English could not show that GE engaged in extreme and outrageous conduct, an essential element of a claim for intentional infliction of emotional distress. The district court's grant of summary judgment is English's third and final assignment of error.
 
 
 7
 For the reasons set forth below, we affirm.
 
 I.
 
 8
 English contends that North Carolina recognizes a separate and distinct claim for bad faith discharge and that, therefore, the district court erred in denying her motion to amend her complaint to add such a claim. We must review the district court's denial of English's motion to amend for an abuse of discretion. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir.1991).
 
 
 9
 In support of her contention, English has relied on dicta from Coman v. Thomas Manufacturing Co., 381 S.E.2d 445 (N.C.1989), in which the North Carolina Supreme Court recognized a public policy exception to North Carolina's employment at-will doctrine, and on subsequent cases which interpreted Coman as also recognizing a separate and distinct claim for bad faith discharge. E.g., McLaughlin v. Barclays American Corp., 382 S.E.2d 836 (N.C.App.), cert. denied, 385 S.E.2d 498 (N.C.1989).
 
 
 10
 Since oral argument in this case, however, the North Carolina Supreme Court has issued its decision in Amos v. Oakdale Knitting Co., 416 S.E.2d 166 (N.C.1992). In that case, several at-will employees were fired for refusing to work for less than the statutory minimum wage. While the Amos court held that the discharged employees had stated a claim for wrongful discharge in violation of public policy, the Amos court also held that Coman did not recognize a separate and distinct claim for bad faith discharge. 416 S.E.2d at 173. See also Salt v. Applied Analytical, Inc., 412 S.E.2d 97 (N.C.App.1991), cert. denied, 415 S.E.2d 200 (N.C.1992) (holding that "there is no independent tort action for wrongful discharge of an at-will employee based solely on allegations of discharge in bad faith").
 
 
 11
 We believe that the North Carolina Supreme Court's decision in Amos disposes of English's first assignment of error. Amos makes clear that North Carolina does not recognize a separate and distinct claim for bad faith discharge. Because English's motion to amend seeks to add a claim for relief which is not recognized in North Carolina, the district court did not abuse its discretion in denying the motion.
 
 II.
 
 12
 English next argues that the district court erred in denying her motion to compel responses to certain requests for production of documents. This court must review the district court's denial of English's motion to compel for an abuse of discretion.[1] See Keyes v. Lenoir Rhyne College, 552 F.2d 579, 581 (4th Cir.), cert. denied, 434 U.S. 904 (1977).
 
 
 13
 The three requests at issue seek documents concerning all complaints of possible contamination since January 1, 1982, all investigations by the Nuclear Regulatory Commission of violations of nuclear safety requirements since January 1, 1972, and all disciplinary actions taken by GE with respect to its employees since January 1, 1972.[2] English argues that the information obtained from the document requests will show that both before and after the actions taken against her, other GE employees who allegedly violated safety and radiation procedures were either not disciplined, or were disciplined much less severely than she. English claims that such information is relevant to a determination of whether or not GE's actions constituted "outrageous conduct," an essential element of English's emotional distress claim.
 
 
 14
 As the district court recognized, English's only extant claim in this case is for intentional infliction of emotional distress. Thus, the only question is whether GE engaged in extreme and outrageous conduct which was intended to cause and did cause severe emotional distress to English. See Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C.1981). The district court suggested that the requested documents might be relevant to a disparate treatment employment discrimination claim but found that they are not relevant to an intentional infliction of emotional distress claim.[3] We agree.
 
 
 15
 In addition, the district court properly found that federal regulations are certain to prohibit disclosure of at least some of the documents sought by Request 8. See 10 C.F.R. § 2.790(d). Moreover, the district court did not abuse its discretion in finding the three document requests overbroad; in particular, Requests 8 and 9 may be viewed as unduly burdensome.
 
 
 16
 In sum, the district court did not abuse its discretion in denying English's motion to compel.
 
 III.
 
 17
 We turn now to the district court's summary judgment ruling on English's intentional infliction of emotional distress claim. In North Carolina, the elements of the tort of intentional infliction of emotional distress are: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another." Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C.1981). In the case at bar, the district court granted summary judgment in favor of GE on the ground that English could not establish one of these elements, namely that GE's conduct was "outrageous." On appeal, English argues that the evidence raises a question of fact as to whether GE's conduct was outrageous and that, therefore, summary judgment is inappropriate. Moreover, English claims that all of GE's allegedly outrageous actions toward her were taken with knowledge that she was "particularly susceptible" to emotional distress.
 
 
 18
 This court must review the grant of a motion for summary judgment under the same standard applied by the district court. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir.1991). Under that standard, summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Furthermore,
 
 
 19
 the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.
 
 
 20
 Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Like the district court, we must view all the evidence in the light most favorable to the non-moving party, in this case English.[4]
 
 
 21
 Before undertaking our analysis of the law and its application to this case, we will lay out the facts in some detail.
 
 A.
 
 22
 The essential facts of this case are not in dispute. From November 13, 1972 until March 15, 1984, English was employed by GE as a laboratory technician in the Chemet Lab at GE's Wilmington facility. Throughout her employment in the Lab, and particularly in late 1983 and early 1984, English complained to GE about what she believed to be safety and quality control problems in the Lab. On December 13, 1983, English met with Eugene Lees, Quality Assurance Manager of the Wilmington facility, and described many of her concerns. She attempted to give Lees some documentation of the alleged problems, but Lees did not accept the documentation. Also on that date, English met with Preston Winslow, Chemet Laboratory Manager, and repeated her concerns. Winslow later took some corrective action with respect to one of those concerns, the improper use of computer passwords.
 
 
 23
 Notwithstanding Winslow's action, English was not satisfied that all the problems she perceived had been corrected. She asked Lees to schedule another meeting, this time including James Long, Wilmington Facility Manager. Lees scheduled a meeting for January 20, 1984. On January 20, however, Long was not present for the meeting. Nevertheless, English began to talk with Lees, and she turned on a tape recorder which she had brought with her. When Lees demanded that English turn off the tape recorder, she did so but asked for a witness to be present at the meeting. When Lees refused to allow either a tape recorder or a witness, English terminated the meeting, but she again requested a meeting with Long.
 
 
 24
 On February 17, 1984, English was called into Lees' office. At this time, Lees gave English a letter directing English to produce all of her evidence concerning her allegations by February 24. The letter stated that English had "specifically refused to share this information" with Lees and warned that "failure to comply with this instruction will be considered insubordination and will result in severe disciplinary action, up to and including discharge." Accordingly, on February 24, English provided Lees a set of written allegations of violations of company practices and procedures. Lees told English not to gather any more information that might result in additional allegations of violations.
 
 
 25
 By this time, English was becoming increasingly unstable emotionally. In the middle of February, following a conversation in her supervisor's office, English sobbed uncontrollably and was essentially hysterical. And on March 8, also after a discussion with her supervisor, she left work in tears.
 
 
 26
 The relationship between the parties came to a head in March 1984. During the week of March 5-9, 1984, English found radioactive contamination left by other employees at her work station. The contamination consisted of uranium powder and uranyl nitrate solution stains. On each of the first four days of the week, English cleaned up the contamination she found. On the graveyard shift beginning March 9, however, English cleaned up some, but not all, of the contamination. She deliberately left some stains on the side of a table and marked the stains with two pieces of red tape. She intended to show the stains to her supervisor two days later, the next time that he would be on duty.
 
 
 27
 On the graveyard shift beginning March 11, English informed her supervisor, William Lacewell, that she was tired of cleaning up contamination left by other workers and that she had placed red tape on some of the contamination two nights earlier. Also, English asked Lacewell if she could use the "frisker" at the entrance to the Lab to check what she thought was contamination on an electrical panel. She obtained his permission, and, after checking the panel, she informed him that the panel was contaminated. Lacewell declined English's invitation for him to confirm her finding and stated that he would have the facility's safety inspectors follow up on it.
 
 
 28
 On March 16, English was called into a meeting with Louis Sheely, Fuel Quality Manager, and Thurston Davis, an Employee Relations Representative. After being questioned generally about the events of the previous week, English was given a disciplinary letter, which had been drafted by Sheely, revised by him and other managers, and signed by Sheely. The letter charged English with "1) the unauthorized removal of the personal survey instrument from the entrance to the laboratory, 2) the deliberate contamination of a table, 3) failure to clean-up the contamination knowing it existed, 4) the continued distraction of other laboratory employees and 5) disruption of normal laboratory activities." In addition, the letter informed English that, due to her "unprecedented disregard of safety rules," she was being removed from the Lab and prohibited from working in "controlled access" areas, which are areas involving access to nuclear material. Finally, the letter stated that English would be reassigned to a temporary position of indefinite duration. After the March 16 meeting, English was escorted by her supervisor to turn in her badge and leave the facility premises.
 
 
 29
 Following her removal from the Lab, English was assigned to Building J, an office building at the Wilmington facility. The desk to which she was assigned was located in an aisle along with other occupied desks. On March 19, her first day in Building J, and periodically thereafter, she was assigned no work to do. At other times she was assigned clerical work, either at her desk or in a warehouse.
 
 
 30
 English appealed the disciplinary action taken against her to Long, the facility manager. A hearing on her appeal was held on May 1, 1984, before a panel including Long, Lees, the quality assurance manager, and Jeff Faucette, Employee & Community Relations Manager. English was allowed to have witnesses "testify" at the hearing, and in fact three witnesses separately attended the hearing. The appeals panel concentrated its review on three of the charges against English: the unauthorized use of the "frisker," the deliberate contamination of a table, and the knowing and intentional failure to clean up contamination.
 
 
 31
 By letter dated May 15, 1984, Long reported to English the outcome of her appeal. The appeals panel dismissed all but one of the charges against English. However, the appeals panel concluded that English "knowingly and intentionally failed to clean up this spill of radioactive material." Such conduct "constitute[d] a very serious and significant violation of the Wilmington plant's health and safety standards and procedures." Thus, the appeals panel upheld English's removal from the Lab and her prohibition from controlled areas. In addition, the appeals panel decided that English's temporary assignment would last for a period of ninety days beginning May 1. According to the letter, during this ninety-day period, the personnel department would review all open positions and offer English appropriate placement, if available. Finally, the letter stated that if English did not secure permanent placement by July 30, 1984, she would be considered as "involuntarily placed on lack of suitable work."
 
 
 32
 English continued to work in Building J and the warehouse. Her assignment there was uneventful, except for one incident. On July 26, 1984, Davis, the employee relations representative, who was delivering a letter to English in the warehouse, noticed that English was not wearing safety shoes. English was working in a part of the warehouse where closed-toed, leather shoes were required for safety. Davis brought this fact to the attention of English's manager in the warehouse. When English showed up the next day in open-toed shoes, she was sent home to change into safety shoes.
 
 
 33
 Throughout her temporary assignment, English checked the posted job openings frequently. However, no job for which she was qualified came available. Thus, her employment with GE was terminated at the end of July 1984. English suffered severe emotional and psychological problems, which apparently arose from her employment at GE.
 
 B.
 
 34
 Having concluded that there is no genuine issue of material fact, we must decide whether the undisputed facts establish that GE engaged in extreme and outrageous conduct as a matter of law. In North Carolina, the standard for extreme and outrageous conduct is a rigorous one: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Briggs v. Rosenthal, 327 S.E.2d 308, 311 (N.C.App.), cert. denied, 332 S.E.2d 479 (N.C.1985); Hardin v. Champion Int'l Corp., 685 F.Supp. 527, 531 (W.D.N.C.1987) (both cases quoting Restatement (Second) of Torts § 46, comment d (1965)). In other words, conduct is outrageous only when it "exceeds all bounds usually tolerated by decent society." Stanback v. Stanback, 254 S.E.2d 611, 622 (N.C.1979) (quoting Prosser, The Law of Torts, § 12, p. 56 (4th Ed.1971)).
 
 
 35
 Courts have applied this high standard in the employment context. "In employment actions, North Carolina courts have been reluctant to find intentional infliction of emotional distress claims actionable." Haburjak v. Prudential Bache Securities, 759 F.Supp. 293, 302 (W.D.N.C.1991). We find only two North Carolina state court decisions in which the plaintiff survived a motion for summary judgment on a claim for intentional infliction of emotional distress arising out of employment. In contrast to the case at bar, both Brown v. Burlington Industries, Inc., 378 S.E.2d 232 (N.C.App.1989), disc. rev. dismissed, 388 S.E.2d 769 (N.C.1990), and Hogan v. Forsyth Country Club, 340 S.E.2d 116 (N.C.App.), disc. rev. denied, 346 S.E.2d 140 (N.C.1986), involved severe sexual harassment. For instance, in Hogan, the North Carolina appeals court reversed summary judgment in favor of the defendant employer where the employer's supervisor allegedly touched and rubbed up against the plaintiff employee, shouted profanities at her when she refused his advances, threatened her with bodily injury, and on one occasion advanced toward her with a knife. The court determined that such conduct, if true, was "beyond the 'bounds usually tolerated by decent society.' " 340 S.E.2d at 121.
 
 
 36
 This court, too, has acknowledged the stringent standard for outrageous conduct. For example, in Keziah v. W.M. Brown & Son, 888 F.2d 322 (4th Cir.1989), we affirmed the district court's grant of summary judgment on the plaintiff's claim for intentional infliction of emotional distress. The plaintiff alleged that, among other things, her telephone messages were withheld and used by male sales representatives to usurp her sales leads, information was secretly removed from her files and mail, and she was "harassed, humiliated and otherwise subjected to an adverse employment environment." Id. at 326. We concluded, however, that the defendant's conduct did "not appear to rise to the required level of intolerability." Id. at 327; see also Patterson v. McLean Credit Union, 805 F.2d 1143 (4th Cir.1986) (affirming district court's grant of directed verdict on plaintiff's claim for intentional infliction of emotional distress because defendant's racially discriminatory conduct was not outrageous).
 
 
 37
 Several other principles should be highlighted. First, a discharge from employment, even if unlawful, does not by itself amount to outrageous conduct. See, e.g., Haburjak v. Prudential Bache Securities, 759 F.Supp. 293 (W.D.N.C.1991) (summary judgment granted where sole allegation to support intentional infliction of emotional distress was termination of employment). Second, like discharge, demotion alone does not amount to outrageous conduct. Hardin v. Champion Int'l Corp., 685 F.Supp. 527 (W.D.N.C.1987) (employer did not engage in outrageous conduct by demoting employee from position as superintendent of over three hundred men to position as leader of eight-man crew). Third, "[t]he liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Briggs, 327 S.E.2d at 311 (quoting Restatement (Second) of Torts § 46, comment d (1965)).
 
 
 38
 As the district court observed, the conduct about which English complains falls generally into four categories. First, English complains about GE's conduct relating to the investigation of English's safety and quality control complaints. She claims that when she brought her concerns to GE's attention, she was ridiculed and belittled, and her concerns were largely ignored. Second, English complains about GE's conduct relating to English's removal from the Chemet Lab and other "controlled access" areas, her reassignment to Building J, and her appeal of her removal and reassignment. Although English admits that she deliberately failed to clean up contamination, she claims that she was falsely charged with the other violations. Additionally, she claims that GE allowed these false charges to be known to other employees. She also alleges that other employees committed "real" safety violations, GE knew which employees were committing those violations, but GE did not discipline those employees. Third, English complains about that conduct relating to her treatment during the four and one-half months that she was assigned to Building J. She alleges that her temporary assignment involved demeaning and menial work and isolated her from other employees. She also claims that no other employees were required to wear safety shoes in the warehouse. Fourth, English complains about her ultimate discharge. She alleges that GE misrepresented that it would assist her in finding another position with GE so that she would not be discharged.
 
 
 39
 Even if true, these allegations--whether considered individually, in any combination, or in the aggregate--do not amount to outrageous conduct. GE's conduct does not approach the outrageous conduct in Brown and Hogan, which involved ongoing severe sexual harassment. While GE's conduct may exceed some of the bounds of decency, its conduct simply does not "go beyond all possible bounds of decency." Moreover, English's allegations are consistently undermined by her own deposition testimony. For instance, although English claims that her concerns were belittled, it is undisputed that GE set up two teams to investigate her complaints, one to investigate her safety concerns and the other to investigate her quality control concerns. In her deposition, English admits that she talked to the leader or a member of each team during its investigation, each team issued a report upon the completion of its investigation, and GE informed her of the results of those investigations. As another example, we note that, despite her complaint of false charges, English admits that GE later accepted her denial of these actions and that the only basis ultimately relied upon for her removal from the Lab was her admitted deliberate failure to clean up contamination.
 
 
 40
 English argues that her condition of being "particularly susceptible" to emotional distress enables her to establish the outrageousness of GE's conduct. She relies on comment f to section 46 of the Restatement (Second) of Torts, which states in full:
 
 
 41
 The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is particularly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, or outrageous when the actor proceeds in the face of such knowledge where it would not be such if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.
 
 
 42
 The emotional condition of English does not enable her to establish outrageousness and thereby defeat the motion for summary judgment. While English might have been "particularly susceptible" to emotional distress, nonetheless GE's conduct did not effect "major outrage."
 
 
 43
 In sum, English cannot establish that GE's conduct was outrageous, an essential element of a claim for intentional infliction of emotional distress. Therefore, summary judgment in favor of GE is appropriate and was properly granted by the district court.
 
 IV.
 
 44
 In summary, we have reached the following conclusions. First, because North Carolina does not recognize a separate and distinct claim for bad faith discharge, the district court did not abuse its discretion in denying English's motion to amend her complaint to add such a claim. Second, the district court did not abuse its discretion in denying English's motion to compel responses to the three document requests. Third, since the undisputed facts do not show that GE engaged in "extreme and outrageous conduct" toward English, summary judgment in favor of GE on English's claim for intentional infliction of emotional distress is appropriate.
 
 
 45
 For all of the foregoing reasons, we affirm.
 
 
 46
 AFFIRMED.
 
 
 
 [1]
 English does not argue that the district court abused its discretion but instead erroneously seeks a de novo review. (Appellant's Brief at 2-3.)
 
 
 [2]
 The three document requests, and GE's responses, are as follows:
 Request 7: Any and [all] records or documents concerning complaints or reports of possible contamination in or arising out of the Chemet lab at any time since January 1, 1982.
 Response: Defendant does not keep documents responsive to this request in any manner which would be retrievable without significant time and expense. Defendant objects to this request because it is overbroad, is not calculated to lead to admissible evidence and the burden of retrieving these materials (to the extent they exist) would outweigh their value.
 Request 8: Any and all reports, correspondence, or other documents concerning any and all findings or citations from the Nuclear Regulatory Commission concerning any violations of nuclear safety procedures or requirements, issued at any time since January 1, 1972 with respect to the Wilmington Fuel Manufacturing Facility.
 Response: Defendant objects to this request because it is overbroad, unduly burdensome and is not calculated to lead to the discovery of admissible evidence. Further, defendant objects to providing documents for which disclosure is prohibited by federal law. Defendant will provide documents pertaining to the Nuclear Regulatory Commission's investigations of plaintiff's allegations for which disclosure has been authorized or which have been produced in prior litigation to plaintiff's counsel for inspection and copying.
 Request 9: Any and all memos, notes, records or other documents concerning any disciplinary action of any sort, taken with respect to any employee or supervisor in the Chemet lab as a result of such employee's or supervisor's failure to follow any and all safety requirements or policies of Defendant, or of any federal or state agency. This request covers the time period from January 1, 1972 through the present.
 Response: Defendant objects to this request because it is overbroad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence.
 (Joint Appendix at 159, 188-89, 279-80; Appellee's Brief at 45.)
 
 
 [3]
 It should be noted that all documents relating to English herself are encompassed by other document requests (Joint Appendix at 157-64), and those documents presumably have been produced by GE
 
 
 [4]
 We need not accept English's allegations at face value. In her brief, English alleges twelve "outrageous actions" taken by GE toward her. (Appellant's Brief at 19-21.) These allegations are not facts but English's characterizations of the facts; indeed English's own deposition testimony consistently undermines her allegations