PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

ELIZABETH K. BRINKLEY,
Plaintiff-Appellant,

v.                                                    No. 98-2035

HARBOUR RECREATION CLUB,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of North Carolina, at New Bern.
Terrence W. Boyle, Chief District Judge.
(CA-97-84-4-1-BO)

Argued: January 25, 1999

Decided: June 14, 1999

Before WILKINSON, Chief Judge, and WILLIAMS
and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Williams wrote the majority
opinion, in which Chief Judge Wilkinson joined. Judge Motz wrote
a dissenting opinion.

_____

COUNSEL

ARGUED: William Joseph Austin, Jr., WARD & SMITH, P.A., New
Bern, North Carolina, for Appellant. Sharon L. McConnell, KIL-
PATRICK STOCKTON, L.L.P., Raleigh, North Carolina, for Appel-
lee. ON BRIEF: Carrie D. Storer, KILPATRICK STOCKTON,
L.L.P., Raleigh, North Carolina, for Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

Elizabeth Brinkley appeals the grant of summary judgment in favor of her former employer, Harbour Recreation Club (HRC), on her Title VII, 42 U.S.C.A. § 2000e-2(a)(1) (West 1994), and Equal Pay Act, 29 U.S.C.A. § 206(d) (West 1998), claims. Brinkley, who was general manager (GM) of HRC, argues that she created a genuine issue of material fact on her Title VII claim when she put forth evidence that demonstrated that some of her superiors on the HRC Board of Trustees (Board) favored her termination because they lamented the loss of a particular greens superintendent who had publicly stated that he was not pleased to work for a woman. Brinkley also asserts that the district court made two errors in addressing her Equal Pay Act claim. First, she alleges that the district court based its summary judgment ruling on an affirmative defense that was improperly raised. Second, she contends that the district court erred when it granted summary judgment to HRC on the basis that HRC had established the "factor-other-than-sex" defense, 29 U.S.C.A. § 206(d)(1)(iv), because HRC had produced insufficient evidence that such a factor motivated HRC's decision to pay her male successor a higher salary. Because we determine that summary judgment was appropriate, we affirm.**1**

I.

These facts, drawn from Brinkley's pleadings, affidavits, and depositions, are expressed in the light most favorable to her as the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (stating that an appellate court reviewing a grant of summary judgment is required to view the facts in the light most favorable to the non-moving party and must draw all reasonable inferences therefrom).

In October 1993, a group of homeowners in the Fairfield Harbour development in New Bern, North Carolina, having purchased their

_____

**1** Our disposition makes it unnecessary for us to address Brinkley's contention that her common law claim for breach of her employment contract should be reinstated. See 28 U.S.C.A. § 1367(c)(3) (West 1993).

2

residential community's country club during Chapter 11 bankruptcy proceedings, organized HRC as a member-owned club. The officers of the HRC Board hired Brinkley to be the club's business manager on October 7, 1993. Brinkley possessed a bachelor's degree in business administration from Ithaca College, but at the time she took the position as HRC's business manager, she had no previous country club experience.[2] Brinkley received a starting salary of $30,000. Her duties as business manager included: setting up and supervising the business office; organizing and maintaining membership records; coordinating insurance coverages; implementing contracts; maintaining corporate documents such as bylaws; assisting the Board in establishing budgets; supervising accounting, record-keeping, and reporting procedures; communicating with members; and selecting and maintaining a computerized point-of-sale system. [3]

In January 1995, after a vote by the HRC Board, Brinkley was promoted to the position of GM of HRC. Shortly before they voted on promoting Brinkley, members of the Board discussed during a meeting with the club staff the possibility of promoting Brinkley to GM. Board members asked the staff whether anyone would have difficulty working with Brinkley in that capacity. One staff member, Dick Brandel, the greens superintendent, stated that he wasn't sure he could work for a woman.

_____

[2] According to her application for employment, Brinkley had previously worked as the corporate finance manager at an electrical supply company in New Bern, North Carolina from 1989 - 1993 and received an annual salary of $26,000. Prior to 1989, Brinkley resided in Massachusetts, where she was the owner/manager/treasurer of a restaurant in Salisbury from 1976 - 1989 and reported a salary of $30,000. While she resided in Massachusetts, Brinkley also held a position as an Administrative Assistant at the Newburyport YMCA from 1988 - 1989 and was compensated at a rate of $10.00 per hour. From 1976 - 1977, Brinkley was financial manager for the Northeast Institute of Alcohol Studies in Peabody, Massachusetts and was paid $10.00 per hour. From 1972 - 1976, Brinkley performed a series of finance-oriented jobs in upstate New York, each paying $10.00 per hour.

[3] At the time Brinkley was HRC's Business Manager there was no GM. Brinkley continued to perform these duties after she was promoted; no new Business Manager was hired. It is undisputed that Brinkley was a highly competent business manager and performed these functions well.

HRC and Brinkley entered into an employment contract prepared by Brinkley on February 16, 1995. The initial term of the contract was three years and provided that her starting salary was $50,000.[4] Brinkley was eligible for cost-of-living increases as well as merit raises over the term of the contract.[5] Further, the contract provided that a two-thirds majority of the Board could vote to terminate Brinkley without cause. In the event of such an occurrence, the Board would be obligated to pay Brinkley for the remainder of the contract term. If, however, a two-thirds majority of the Board determined that Brinkley was guilty of fraud and abuse in the performance of her duties or of gross negligence, the employment contract could be terminated immediately.

At the end of Brinkley's first year as GM, the club had lost $166,111. At the same time, the Board became concerned about the poor working relationship that had developed between Brinkley and Brandel, the greens superintendent. Brinkley and Brandel became embroiled in a dispute regarding expenses Brandel had incurred. Brinkley concluded that Brandel had incurred unauthorized personal expenses and requested that he reimburse HRC. Brandel refused to reimburse HRC; Brinkley considered the refusal to be an act of insubordination and requested that the Board support Brandel's termination. A majority of the Board did not support Brandel's termination. Instead, the Board altered the reporting relationship between Brandel and Brinkley. After the Board's vote, Brinkley and Brandel were instructed that henceforth Brandel was to report to the golf pro rather than to Brinkley. Additional concerns over her job performance arose among members of the Board when Brinkley led a membership forum meeting in February 1996 during which the Board members concluded that Brinkley had made inappropriate comments about HRC's management and her relationship with the Board.

Dick Brandel eventually resigned from HRC in May of 1996. Later, Brinkley was informed that "you did not win with Dick Brandel leaving." (J.A. at 393.) Also in May, a Board member circulated

_____

[4] Brinkley proposed the $50,000 figure and the Board agreed to that amount.
[5] Over the course of her employment as GM, Brinkley never received a raise.

4

a memorandum proposing that golf operations be made a separate autonomous operation headed by the director of golf and suggesting that Brinkley be demoted back to the position of business manager. Although this plan was never formally implemented, on June 5, 1996, Brinkley was instructed "not to micromanage golf." (J.A. at 393-94.) A few days later, during a discussion with the golf pro, Brinkley expressed her anger with the fact that the golf pro had been communicating directly with the Board. Brinkley complained that this behavior was undermining her authority as GM. At the conclusion of their meeting Brinkley said, "If this [is] the way you're going to do it, you can sink or swim on your own." (J.A. at 37.)

On June 11, 1996, the Board had a meeting with the golf pro. After the meeting, representatives of the Board approached Brinkley and told her that they would have to abide by her decision to relinquish management of the golf operation on a temporary basis, but that the Board wanted a cohesive management team and was disturbed by the division of management. After considering their options, the Board informed Brinkley that her employment contract for the GM position would not be renewed as a result of her decision to give up managing HRC's golf operation. On July 9, 1996, the Board proposed that Brinkley continue at HRC as restaurant manager. On July 11, 1996, Brinkley informed that Board that she would not accept the position of restaurant manager.

Nevertheless, the Board decided to hire someone new to take over management of HRC. After an interview on July 13, 1996, James Paschal, who had eleven years of country club management experience, was hired to take on the position of chief operating officer[6] (COO) on a temporary, ninety-day basis while the Board decided how to proceed. On July 19, 1996, Paschal signed a ninety-day contract providing that his salary would be $1,200 per week plus free meal privileges.[7]

_____

[6] The position was renamed to avoid confusion with Brinkley, who was still serving as the GM at the time Paschal started at HRC, and to reflect the current trend in country club management.

[7] On an annualized basis, the salary of $1,200 per week would be $62,400 ($12,400 more than Brinkley was earning as GM). Additionally, although Brinkley received discounted meals at the club, she did not receive free meals as provided to Paschal.

5

This salary represented a mutually agreeable temporary arrangement based upon what the Board felt it could afford.

Prior to the termination of his ninety-day contract, the Board decided to hire Paschal as the permanent COO. On September 1, 1996, Paschal and HRC entered into a contract that provided for a salary of $75,400 per year. Under the contract, Paschal's free meal privileges continued. Additionally, the contract provided that Paschal would be compensated in the amount of $300 per month as an automobile allowance. The Board determined that $75,400 would be an appropriate salary on the basis of Paschal's prior salary history and information it sought from the Country Club Managers Association regarding the average salary figures at similar-sized clubs. At about the same time, on August 30, 1996, Brinkley took three weeks of vacation at the direction of Paschal. Upon her return, on September 23, 1996, the Board terminated Brinkley's employment contract for cause. The Board determined by a unanimous vote that Brinkley had been grossly negligent in the performance of her duties. Specifically, the Board noted that Brinkley unilaterally had terminated her management of the golf operation, had exercised poor judgment handling two problematic contracts, had failed to consult with the Board over personnel matters, had promoted an unqualified employee to the position of restaurant manager, had given misinformation regarding a capital equipment purchase, and had publicly aired her opinion that she did not agree with Board policy to HRC members.

II.

As a result of the foregoing events, Brinkley filed a written charge with the EEOC claiming that she had been demoted, terminated, and otherwise discriminated against on the basis of sex. After receiving a right-to-sue letter, Brinkley filed suit in the United States District Court for the Eastern District of North Carolina. In her complaint, Brinkley made three claims for relief. First, Brinkley claimed that her termination from HRC was the result of discrimination on the basis of sex, a violation of Title VII. 42 U.S.C.A. § 2000e-2(a)(1) (West 1994). In her second claim, Brinkley alleged that HRC hired a male as COO to perform identical duties to those that she had performed as GM and paid him a higher salary in violation of the Equal Pay Act. 29 U.S.C.A. § 206(d) (West 1998). Finally, Brinkley averred that her

6

termination was a result of HRC's breach of her employment contract.

After undertaking discovery, the parties filed cross-motions for summary judgment. The district court denied Brinkley's motion for summary judgment and granted HRC's. As a result, the district court also dismissed without prejudice the breach of contract claim over which it had taken supplemental jurisdiction. In granting HRC's summary judgment motion, the district court reasoned that Brinkley had failed to establish a prima facie case of discrimination under Title VII. Specifically, the district court held that Brinkley had not met her burden of proving that she was replaced by a man with comparable qualifications because HRC had established that Paschal had significant prior experience in country club management lacked by Brinkley. Additionally, the district court concluded that Brinkley had not been performing her job as GM at a level that met the Board's expectations. The district court also concluded that summary judgment was appropriate on Brinkley's Equal Pay Act claim because HRC had proven an affirmative defense under the Act, i.e., that the pay differential was based upon a "factor other than sex." Specifically, the district court determined that HRC had presented adequate evidence to show that Paschal's superior experience and salary history, neither a factor related to sex, accounted for the pay differential between Brinkley and Paschal. Brinkley filed a timely notice of appeal.

On appeal, Brinkley makes three primary arguments. First, Brinkley asserts that the district court erred when it concluded that she had not made out a prima facie case on her Title VII claim. Next, she claims that the district court erred when it considered HRC's affirmative defense -- that the pay differential between Paschal and Brinkley was based upon a "factor other than sex" -- because that affirmative defense was not properly raised in HRC's answer, but rather was first raised in HRC's summary judgment motion in violation of Rule 8 of the Federal Rules of Civil Procedure. In the alternative, Brinkley maintains that the district court erred in granting summary judgment to HRC on the Equal Pay Act claim because, even if the affirmative defense was properly raised, the evidence put forth by HRC was insufficient to establish the defense by a preponderance of the evidence.

7

We review de novo the district court's decision to grant HRC summary judgment. See Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in her favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Guided by these principles, we address Brinkley's arguments that summary judgment was improper seriatim.

III.

Brinkley first contends that the district court erred when it granted summary judgment on her Title VII claim. Brinkley's claim in this regard is two-fold. First, she asserts that the district court erred because she had produced sufficient direct and indirect evidence that discrimination led to her demotion and eventual termination from the GM position to establish a prima facie case without applying the McDonnell Douglas presumption. Second, Brinkley asserts that even if she had not produced sufficient direct and indirect evidence of discrimination, then she produced circumstantial evidence sufficient to satisfy the McDonnell Douglas proof scheme. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Upon those two bases, Brinkley argues that the district court erred in ruling that she had not established a prima facie case.

A.

There are two avenues of proof by which an aggrieved employee can prove a Title VII violation. See Burns v. AAF-McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996). First, an employee may utilize "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue." Tuck v. Henkel Corp., 973 F.2d 371, 374 (4th Cir. 1992). To overcome a summary judgment motion based upon this method of proof, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of

8

material fact." Goldberg v. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988). "What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995). If such evidence is lacking, the plaintiff may nevertheless proceed under McDonnell Douglas. See Tuck, 973 F.2d at 374.

McDonnell Douglas first requires that the plaintiff establish a prima facie case of discrimination by a preponderance of the evidence. See McDonnell Douglas, 411 U.S. at 802. To establish a prima facie case of discrimination under Title VII, Brinkley must show (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that at the time of the adverse employment action she was performing at a level that met her employer's legitimate job expectations; and (4) that the position remained open to or was filled by similarly qualified applicants outside the protected class. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07 (1993); Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998); Williams v. Cerberonics, Inc., 871 F.2d 452, 455 (4th Cir. 1989). Once the prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the employer meets its burden of production, the presumption of discrimination raised by the prima facie case is rebutted and "drops from the case," id. at 255 n.10, and the plaintiff bears the ultimate burden of proving that she has been the victim of discrimination, see St. Mary's Honor Ctr., 509 U.S. at 507.

B.

Brinkley initially claims that she has put forth sufficient direct and indirect evidence of discrimination to create a genuine issue of material fact to survive summary judgment on her Title VII claim. She points to several pieces of evidence in support of this assertion. First, Brinkley notes that prior to her promotion to the GM position, Brandel, the greens superintendent, a future subordinate, announced that he would have difficulty working for a woman. Next, she asserts that Brandel was a very popular and highly valued employee among male

9

members of the Board who eventually made the decision to terminate her. Further, she alleges that because Brandel did not function well under female management, the Board reorganized the reporting relationships so that Brandel would report to the male golf pro. Brinkley also claims that several male members of the Board found her to be blame-worthy for Brandel's eventual resignation from HRC. Brinkley additionally points to statements in an affidavit from a former club treasurer that indicate that the treasurer believed that a specific male member of the Board had difficulty accepting women's views if they differed from his own. Finally, Brinkley asserts that her replacement, Paschal, made sexually suggestive comments about another female employee in her presence and also made several stern warnings that Brinkley's job was in jeopardy.**8**

The evidence Brinkley catalogs is not sufficiently probative to raise a genuine issue of material fact on the issue of whether the Board harbored discriminatory animus that resulted in Brinkley's demotion and termination. To survive summary judgment on the basis of direct and indirect evidence, Brinkley must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action. See Fuller, 67 F.3d at 1142; EEOC v. Clay Printing, 955 F.2d 936, 942 (4th Cir. 1992). In this case, Brinkley has produced a few isolated statements indicating sexist attitudes at HRC, but utterly fails to connect any of the incidents with her eventual demotion and termination.

Certainly, Brinkley's evidence that Brandel made a statement that he could not work for a woman is an example of a derogatory comment uttered by a coworker. Derogatory remarks may in some instances constitute direct evidence of discrimination, see O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 548 (4th Cir. 1995), rev'd in part on other grounds, 517 U.S. 308 (1996), but "Title VII was not designed to create a federal remedy for all offensive language . . . in the workplace." Hopkins v. Baltimore Gas & Elec., 77 F.3d 745, 754 (4th Cir. 1996). Thus, to prove discriminatory animus,

_____

**8** Due to Brinkley's employment contract and efforts to keep Brinkley at HRC in an alternate position or reach a financial settlement with her, Brinkley's replacement, Paschal, was hired approximately two months prior to her termination.

10

the derogatory remark cannot be stray or isolated and "[u]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of[discrimination]." McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 686 (7th Cir. 1991). Here, the remark was an isolated event; the record reflects that Brandel uttered it only once. Further, it is plain that there was no nexus between the remark and Brinkley's eventual termination from HRC. Brandel's statement was made at a meeting prior to Brinkley's promotion to GM. It is not a reasonable inference from the evidence that the derogatory comment caused Brinkley's termination, when in fact the Board ignored the remark and promoted Brinkley shortly after the comment was made. Brinkley was not terminated for over eighteen months after the offensive utterance. Brinkley makes three other factual assertions regarding Brandel that are also insufficient to create a genuine issue of material fact: (1) that male members of the Board highly valued Brandel's professional services; (2) that reporting relationships were reorganized so Brandel could report to a man; and (3) that several male members of the Board blamed Brinkley for Brandel's eventual resignation from HRC. The evidence contained in the record, however, belies Brinkley's claims that the Board's attitude was related to her sex. Brinkley and Brandel were having a dispute and were not working well together. The record indisputably shows that the Board's revamping of the reporting relationship between Brinkley and Brandel was a result of the Board's desire to avoid further conflict. Although Brinkley makes bald assertions to the contrary, there is simply no evidence to support her contentions that the Board acted on the basis of her sex. Finally, Brinkley's claim that certain male members of the Board valued Brandel's services highly and held Brinkley accountable for his resignation, simply is not probative of the issue of discriminatory animus.

Additionally, Paschal's inappropriate statement about the physical attributes of a waitress is not relevant evidence of discriminatory animus leading to Brinkley's termination, because the decision to demote Brinkley had already been made at the time Paschal began work at HRC. At that time, Brinkley had already been offered, and had rejected, the alternative position of restaurant manager. Although Brinkley was still at the club and still technically the GM while she and the Board were negotiating possible job alternatives or a potential financial settlement, the Board's decision-making was completed

11

before Paschal arrived. The record does not support the conclusion that Paschal acted in a manner that affected the Board's eventual decision to terminate Brinkley.

Finally, the treasurer's statement that a certain male member of the Board was not receptive to women's views is also inadequate direct evidence to show discriminatory animus against Brinkley. The treasurer's affidavit merely states her personal opinion in a conclusory fashion. The affidavit cites no specific factual examples supporting her opinion that male members of the Board discredited women's ideas.

In sum, none of the evidence Brinkley lists, taken singularly or collectively, is sufficient to raise a genuine issue of material fact as direct or indirect proof of discrimination. Although Brinkley points to some unpleasant occurrences during her tenure at HRC, the evidence she has adduced lacks a sufficient connection to the employment decision to be probative on whether her demotion and termination were the result of discrimination.

C.

Next, Brinkley claims that the district court erred when it concluded that she had not proven her prima facie case under McDonnell Douglas. Here, the prima facie case contains four elements: (1) that Brinkley is a member of a protected class; (2) that she suffered an adverse employment action; (3) that at the time of the adverse employment action she was performing at a level that met her employer's legitimate job expectations; and (4) that the position remained open to or was filled by similarly qualified applicants from outside the protected class. See St. Mary's Honor Center, 509 U.S. at 506-07; Karpel, 134 F.3d at 1228; Williams, 871 F.2d at 455. There is no dispute that Brinkley established the first two elements of the prima facie case. Thus, we focus our review of the district court's grant of summary judgment to HRC on the third and fourth elements of Brinkley's prima facie case.

Regarding the third element of the prima facie case, whether Brinkley had been performing her job at a level that met her employer's expectations, the district court initially noted that there was conflict-

12

ing evidence presented regarding "how well Brinkley functioned in her role as [GM]." (J.A. at 503.) Ultimately, however, the district court concluded that "Brinkley was not performing her duties in the manner that HRC expected and this caused conflict between employer and employee." (J.A. at 506.) After a thorough review of the record, we conclude that the district court's observation and ultimate conclusion that Brinkley was not meeting the Board's expectations was correct; Brinkley did not adduce sufficient evidence to raise a genuine issue of material fact on this issue.

There is no doubt that the Board was pleased with Brinkley's performance as business manager prior to her promotion to GM. In deposition testimony, several Board members praised Brinkley's performance as business manager. A performance evaluation of Brinkley's work as business manager was conducted in December of 1994 and she received an overall rating of "B+." Brinkley's good work as business manager is further verified by the Board's decision to give her the opportunity to become GM of HRC. Brinkley argues that she performed many of the same functions initially assigned to her while she was business manager after she was promoted to GM, and that therefore, because the Board was satisfied with her performance as business manager, she has raised a genuine issue of material fact on the issue of the Board's satisfaction with her overall performance. Brinkley's argument, however, misses the mark.

After Brinkley was promoted to GM, the Board continued to be satisfied with her performance in the business office, and indeed was satisfied with that portion of her job performance until she was terminated. Unfortunately, work in the business office no longer accounted for Brinkley's entire job, and the Board was concerned with her performance in other areas. The record conclusively demonstrates that, beginning in December of 1995, the Board determined that Brinkley needed improvement in some important job areas. Specifically, in December of 1995, Brinkley's evaluation noted that she most needed improvement in five areas. Two of the five areas in which the Board noted a need for improvement involved relationship-building skills. The Board concluded that she needed improvement in developing "[w]orking relationship[s] with department managers to form a cohesive management team." (J.A. at 408.) The evaluation also noted that

13

she needed to concentrate on improving her working relationships with committee members.**9**

Each of the three extensive deposition excerpts of Board members indicate the same thing: the Board's concern with Brinkley's lack of a team-building management style. The Board was not only disturbed by the degeneration of Brinkley's relationship with Brandel, but also by the fact that Brinkley was unable to mend fences and return to working productively with him after the Board had settled their dispute.

The Board's continuing concern over Brinkley's team-building skills reached a peak when Brinkley became angry at the golf pro for circumventing her authority by reporting directly to the Board, and she told him that he could "sink or swim on [his] own." (J.A. at 37.) The Board concluded that not only had Brinkley given up on managing the golf operation at the club, one of her primary duties, but also that she had done so in a way that irreparably damaged her relationship with the golf pro. Representatives of the Board discussed the fact that they were troubled by Brinkley's management style at great length in her verbal evaluation conducted July 9, 1996, shortly before Paschal was hired. The crux of the conversation during her verbal evaluation was that the Board was displeased that Brinkley was not able to form a cohesive management team, and that as a result they thought Brinkley should no longer perform the duties of GM.

Thus, the overwhelming evidence supports the district court's conclusion that Brinkley had not been performing her job satisfactorily. There is a long and well-documented pattern of rising levels of concern among Board members over Brinkley's apparent inability to bring together the different managers at the club to form a single team. As a result of this undisputed evidence, summary judgment was appropriate because Brinkley could not establish the third element of her prima facie case.

_____

**9** The Board also noted that Brinkley needed improvement in the areas of "[f]ollow-up and interim status reporting on matters in process;" "[b]udget preparation procedures;" and"[d]ocumentation and implementation of operating procedures." (J.A. at 408.)

14

The district court also ruled that Brinkley had not been successful in proving the fourth element of her prima facie case, that Paschal, her replacement, possessed similar qualifications. The district court concluded that "Paschal had superior qualifications for the position of chief of operations of HRC. He had extensive prior experience in country club management while [Brinkley] had no such experience prior to her employment with HRC." (J.A. at 505.)

Here, too, the district court's conclusion was correct. It is undisputed that Paschal had eleven years of country club management experience and that he previously had been the GM at two other country clubs. The two positions that Brinkley held at HRC were her first exposure to country club employment. Brinkley argues, however, that the district court should have assessed additional factors before concluding that Brinkley and Paschal were not comparably qualified. First, Brinkley notes that she completed her bachelor's degree in business administration while Paschal had not completed his bachelor's degree. Further, Brinkley points out that Paschal had been terminated from a hotel manager position listed on his resume, while Brinkley's employment history was completely favorable.

These additional differences between Brinkley and Paschal, however, do not lead to the conclusion that the two possessed substantially similar qualifications. Instead, Brinkley further demonstrates the contrast between herself and Paschal. Although HRC initially gave its unproven business manager the opportunity to advance within the company and try her hand as GM, when HRC became dissatisfied with Brinkley's performance it sought a candidate with distinctly different credentials -- an extensive history of country club management. Experience in the industry, including two prior GM positions, constitutes a qualitatively different criterion upon which to base an employee's selection. Cf. Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998) (noting that experience in the relevant field is a legitimate basis upon which to differentiate employees). Thus, we agree with the district court's conclusion that Brinkley and Paschal were not similarly qualified for the position and that as a result Brinkley was unable to establish her prima facie case under the McDonnell Douglas proof scheme.

As a result of Brinkley's inability to establish either the third or the fourth elements of her prima facie case, the district court did not err

15

in granting summary judgment to HRC on Brinkley's Title VII claim. We note, however, that although helpful, the McDonnell Douglas framework should not be applied in a "rigid, mechanized, or ritualistic" manner. Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978). Rather, the test is "merely a means to fine-tune the presentation of proof and, more importantly, to sharpen the focus on the ultimate question -- whether the plaintiff successfully demonstrated that the defendant intentionally discriminated against her." Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 59 (4th Cir. 1995). Although Brinkley may have adduced sufficient evidence from which a reasonable juror could conclude that the Board had treated her callously, such evidence is insufficient to support a Title VII claim. Brinkley has utterly failed to meet her burden of demonstrating that she was demoted and terminated because of sex.

IV.

Brinkley also challenges the district court's grant of summary judgment on her Equal Pay Act claim. 29 U.S.C.A. § 206(d) (West 1998). She does so on two grounds: (1) that the district court erred when it considered HRC's affirmative defense that the pay differential between Paschal and Brinkley was based upon a "factor other than sex," 29 U.S.C.A. § 206(d)(1)(iv), because that affirmative defense was not properly raised in HRC's answer, but rather was first raised in HRC's summary judgment motion in violation of Rule 8 of the Federal Rules of Civil Procedure; and (2) that the district court erred in granting summary judgment to HRC on the basis that it had established the "factor-other-than-sex" defense because evidence put forth by HRC was insufficient to establish that affirmative defense at the summary judgment stage of the proceedings. We address these contentions in turn.

A.

Brinkley first asserts that HRC waived its affirmative defense that the pay differential between Brinkley and Paschal was the result of "any other factor other than sex," 29 U.S.C.A.§ 206(d)(1)(iv) (West 1998), when it did not raise that defense in its answer, but instead first raised it in its motion for summary judgment. Because the defense was not properly raised, Brinkley argues that it was error for the dis-

16

trict court to consider the defense. We conclude that Brinkley was not unfairly surprised or prejudiced by HRC's late notice that it intended to rely on the "factor-other-than-sex" defense. Therefore, we determine that the district court did not err when it considered the defense.

Federal Rule of Civil Procedure 8(c) provides, in pertinent part, as follows: "In pleading to a preceding pleading, a party shall set forth affirmatively . . . [any] matter constituting an avoidance or affirmative defense." Fed. R. Civ. P. 8(c). Such defenses should be set forth in "short and plain terms," Fed R. Civ. P. 8(b), and should be "simple, concise, and direct," Fed. R. Civ. P. 8(e)(1). The parties agree that the "factor-other-than-sex" defense to the Equal Pay Act is an affirmative defense. See Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 344 (4th Cir. 1994). Therefore, under Rule 8(c), the defense should have been raised in HRC's answer. HRC did not note its intention to rely upon the defense in its answer.

Although it is indisputably the general rule that a party's failure to raise an affirmative defense in the appropriate pleading results in waiver, see 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1278 (1990), there is ample authority in this Circuit for the proposition that absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion, see Peterson v. Airline Pilots Ass'n, 759 F.2d 1161, 1164 (4th Cir. 1985) (holding that waiver is not automatic, but requires a showing of prejudice or unfair surprise); see also American Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 96 (4th Cir. 1996) (evaluating prejudice to plaintiff when considering timeliness of affirmative defense of arbitration); Nasim v. Warden, 42 F.3d 1472, 1475-76 (4th Cir.) (noting that, in limited circumstances, affirmative defense of statute of limitations need not be raised in answer if demonstrated conclusively on the face of the complaint), vacated on other grounds, 64 F.3d 951 (4th Cir. 1995) (en banc); Polsby v. Chase, 970 F.2d 1360, 1364 (4th Cir. 1992) (noting that affirmative defenses may be pleaded in pre-trial motions and that the district court did not abuse its discretion by permitting defendant to raise an affirmative defense after the answer); vacated and remanded on other grounds, 507 U.S. 1048 (1993). This view is in accord with the vast majority of our sister circuits. See, e.g., Blaney v. United States, 34 F.3d 509, 512 (7th Cir. 1994) (stating that

17

an unpleaded untimeliness defense could be raised in motion to dismiss); Camarillo v. McCarthy, 998 F.2d 638, 639 (9th Cir. 1993) (holding that an affirmative defense may be raised at summary judgment absent prejudice to opposing party); Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1445 (6th Cir. 1993) (asserting that an affirmative defense may be raised in response to summary judgment motion); Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1374 (3d Cir. 1993) (noting that an affirmative defense may be raised at summary judgment absent prejudice); Ball Corp. v. Xidex Corp., 967 F.2d 1440, 1443-44 (10th Cir. 1992) (raising affirmative defense in summary judgment motion preserved defense for trial three months later). But see Harris v. Secretary, U.S. Dep't of Veterans Affairs, 126 F.3d 339, 342 (D.C. Cir. 1997) (disagreeing with the majority approach and holding that the approach alters the structure dictated by Rules 8(c) and 15(a) by relieving parties of the need to request amendment and by promoting strategic behavior); Ashe v. Corley, 992 F.2d 540, 545 n.7 (5th Cir. 1993) (disposing of several affirmative defenses not raised in the answer without evaluating prejudice to the plaintiff).

In this instance, the district court correctly concluded that Brinkley was not unfairly surprised or prejudiced by HRC's delay in raising the "factor-other-than-sex" defense. HRC had raised and litigated this defense during the EEOC's consideration of the matter. Therefore, Brinkley had fair warning that the defense was likely to arise again in the district court. See American Recovery Corp., 96 F.3d at 96 (finding no prejudice where plaintiff was on notice of defendant's plan to pursue arbitration prior to answer even though defendant failed to raise it in answer). Further, Brinkley had ample opportunity to respond to HRC's summary judgment motion in which it initially raised the "factor-other-than-sex" defense. As a result, we conclude that Brinkley was not unfairly surprised or prejudiced by HRC's delay in raising its affirmative defense; the district court did not err in considering it.

B.

Brinkley next claims that the district court erred when it ruled that HRC had conclusively demonstrated that a "factor other than sex," 29 U.S.C.A. § 206(d)(1)(iv), motivated its decision to pay Paschal a higher salary than Brinkley had been earning to perform the identical

18

job and granted summary judgment to HRC upon that basis. Brinkley claims that insufficient evidence supported the district court's ruling in HRC's favor and that genuine issues of material fact remained to be resolved regarding whether HRC has paid Paschal a higher salary based upon a factor other than sex.

1.

The Equal Pay Act provides:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: <u>Provided</u>, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C.A. § 206(d)(1).

As under Title VII, a plaintiff bringing a claim under the Equal Pay Act must first establish a prima facie case of wage discrimination. To establish a prima facie case, Brinkley must prove: (1) that her employer has paid different wages to employees of opposite sexes; (2) that said employees hold jobs that require equal skill, effort, and responsibility; and (3) that such jobs are performed under similar working conditions. <u>See Corning Glass Works v. Brennan</u>, 417 U.S. 188, 195 (1974). Plaintiff may use her successor in the position as a salary comparator for purposes of establishing the prima facie case. <u>See</u> 29 C.F.R. § 1620.13(b)(4) (1998).

19

Unlike a Title VII case, however, under the Equal Pay Act, upon establishing a prima facie case, both the burdens of production and persuasion shift to the defendant. See Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 344 (4th Cir. 1994). The defendant bears the burden of proving by a preponderance of the evidence that the wage difference between the male and female employees was the result of one of the four enumerated statutory affirmative defenses: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C.A. § 206(d)(1); see also Strag v. Craven Commun. College, 55 F.3d 943, 948 (4th Cir. 1995).

In this case, the district court ruled that HRC had adduced sufficient evidence to establish that Paschal was paid "a differential based on any other factor other than sex," 29 U.S.C.A.§ 206(d)(1)(iv), at the summary judgment stage of the proceedings. The defendant may prevail on its motion for summary judgment and establish an affirmative defense when it has produced "credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting); accord Fitzpatrick v. Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993); Mesnick v. General Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991); International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991). When the defendant produces such evidence supporting its affirmative defense, the burden of production shifts back to the plaintiff who "must come forward with `specific facts showing that there is a genuine issue for trial.'" White v. Rockingham Radiologists, Ltd., 820 F.2d 98, 101 (4th Cir. 1987) (quoting Fed. R. Civ. P. 56(e)). "[S]ummary judgment will not lie if the dispute about a material fact is `genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A motion for summary judgment may not be defeated, however, by evidence that is "merely colorable" or "is not significantly probative."[10] Id. at 249-50.

_____

[10] The dissent misreads this paragraph and erroneously focuses on the first sentence to reach its conclusion that "this statement improperly sug-

20

2.

On appeal, the parties do not dispute that Brinkley established a prima facie case of an Equal Pay Act violation. The first question before us, then, is whether HRC supplied the district court with sufficient credible evidence to support the "factor-other-than-sex" defense. Such evidence is sufficient if the court can conclude that had the same evidence been presented and remained uncontested at trial, HRC would be entitled to a directed verdict. See International Shortstop, 939 F.2d at 1264-65.

HRC presented the following evidence in support of its affirmative defense: (1) Paschal's resume indicating his extensive country club management experience; (2) Paschal's deposition in which he stated that he understood that he received a higher salary and better perks because he had a higher salary history, had initially taken the job on a temporary basis, and had a high level of knowledge about the country club industry gained in his prior GM positions; (3) Brinkley's employment application indicating her lack of country club experience and her low salary history; (4) the fact that when Brinkley accepted the position of GM, she received a $20,000 raise from the salary she had been earning as business manager; (5) deposition testimony by members of the Board that they reached mutual agreement on Paschal's salary based upon what they felt the country club could afford to pay; and (6) deposition testimony by Board members stating

_____

gests that a court may award summary judgment on the basis of the movant's evidence alone." Post at 27. The paragraph when fairly read as a whole makes it quite clear that the moving party's production of evidence is only the first step in the summary judgment inquiry when, as in this case, the moving party will bear the burden of proof at trial. Of course, in instances when the nonmoving party presents no evidence at all to contest the moving party's proffer, no genuine issue of material fact has been created and summary judgment is appropriate based upon the moving party's evidence alone. See Strag v. Craven Commun. College, 55 F.3d 943, 951 (4th Cir. 1995) ("Indeed, although a motion for summary judgment generally should not be granted if there exists a genuine issue of material fact that warrants a trial on the issues, such a motion cannot be denied unless the non-moving party puts forth specific facts evidencing that such a genuine issue does exist.").

21

that they researched appropriate salary through consultation with the Country Club Managers Association, which indicated that a typical salary for a club of their size was approximately $100,000 per year.

With this evidence, HRC met its burden of producing sufficient evidence, which, if uncontroverted, would have entitled it to a directed verdict had the case proceeded to trial. The evidence presented by HRC points clearly to only one conclusion-- that HRC and Paschal followed procedures that are standard in the employment marketplace. HRC reviewed a resume and salary history, assessed its financial situation, compared its situation with that of other similarly situated entities, and negotiated with Paschal to reach a mutually satisfying agreement as to an appropriate salary. The evidence indicates that HRC reached this agreement on the basis of Paschal's individual merits, not on the basis of his sex. A survey of the record reflects that the Board followed the same procedures when it evaluated Brinkley's initial salary.[11]

Our inquiry does not end, here, however. When the defendant produces sufficient evidence in support of its affirmative defense, the burden of production shifts back to the plaintiff. See International Shortstop, 939 F.2d at 1265. The plaintiff must produce specific evidentiary materials that demonstrate the existence of a "genuine issue for trial." White v. Rockingham Radiologists, Ltd., 820 F.2d at 101 (citing Fed. R. Civ. P. 56(e)). Brinkley has not produced sufficient evidence to meet this burden.[12] She has not produced any evidence

---

[11] The dissent makes much of the fact that the Board "fail[ed] to investigate an appropriate salary" for Brinkley before promoting her to the General Manager position, as it did before offering the position to Paschal. Post at 30. Brinkley never raised the Board's failure to research an appropriate salary as proof of discrimination, nor could she -- the Board gave her a $20,000 raise, exactly what she requested.

[12] The dissent chides us because we haven't cited Fowler v. Land Management Groupe, Inc., 978 F.2d 158 (4th Cir. 1992), and Keziah v. W.M. Brown & Son, Inc., 888 F.2d 322 (4th Cir. 1989). Those cases demonstrate that when the plaintiff adduces sufficient evidence controverting an employer's assertion that higher salary is due to more experience, a genuine issue of material fact can arise. The legal proposition is unremarkable. Factually, we conclude that the quantum of evidence adduced by

22

that indicates that Paschal was paid more, or that she was paid less, because of sex.**13**

_____

Keziah and Fowler distinguish the cases. In <u>Keziah</u>, although the employer stated that Keziah was paid less due to inferior experience, the evidence tended to show that Keziah has ten years of experience within the relevant industry whereas the male comparator had no similar experience and was required to attend a two-week training course to familiarize himself with the industry. <u>See</u> 888 F.2d at 325. Also, although the company stated that it expected the male to generate more revenue for the company, evidence demonstrated that the sales manager had set equal sales goals for Keziah and the male comparator for the first two years and that in the third year of employment Keziah was assigned a higher sales goal. <u>See id.</u> at 326. Similarly, in <u>Fowler</u> the plaintiff produced several witnesses to contradict the employer's statement regarding the value of the comparator's experience. <u>See</u> 978 F.2d at 161. Brinkley did not produce a similar quantity of evidence to controvert HRC's affirmative defense and did not raise a genuine issue of material fact. <u>See Strag</u>, 55 F.3d 943, 951 (4th Cir. 1995) (holding that the plaintiff must put forth evidence to rebut the defendant's initial evidence showing a gender neutral reason for the pay differential).

**13** The dissent places too much emphasis upon the prima facie case under the Equal Pay Act. As a result, the dissent creates a schema under which all Equal Pay Act claims in which the prima facie case has been made out must proceed to trial. The dissent's first error is characterizing the prima facie case as "creat[ing] a presumption of discrimination." <u>Post</u> at 27. Actually, the Equal Pay Act's prima facie case is a traditional one -- proof of the elements establishes a violation of the Act. No presumption, as that phrase is most often used in common legal parlance, has been created. Although the dissent is correct in noting that <u>Brinkley-Obu v. Hughes Training, Inc.</u>, 34 F.3d 336, 344 (4th Cir. 1994), uses the term "presumption" to describe the effect of establishing the EPA's prima facie case, <u>Brinkley-Obu</u> does not use the term in the <u>McDonnell-Douglas</u> sense, nor does it describe an irrebuttable presumption. Through the prima facie case, the plaintiff has demonstrated a pay differential -- that an employer has paid members of the opposite sex different wages to perform jobs that require "equal skill, effort, and responsibility, and which are performed under similar working conditions," 29 U.S.C.A. § 206(d)(1) (West 1998). If the defendant does not justify the differential by proving one of the statutory affirmative defenses, the defendant loses the case.

23

In support of her argument that summary judgment was inappropriate, Brinkley points to the gender hostility evident at the club as verified by Brandel's remark that he could not work for a woman as well as Paschal's inappropriate comment about the physical attributes of a waitress. As we noted earlier, however, Brandel's statement was made before Brinkley was promoted to the position of GM. The Board effectively ignored this isolated comment when it promoted Brinkley, and thus, it is not indicative of a gender-hostile workplace. Additionally, Paschal was reprimanded by the Board for his statement about the waitress, an action that also indicated that the Board was not harboring gender-based hostility.

Further, Brinkley disputes the contention that Paschal had superior qualifications for the GM position. She notes that Paschal lacked a bachelor's degree and had been fired from a hotel manager position listed on his resume. These purported deficiencies, however, do not overcome the undisputed fact that Paschal's resume indicated that he had eleven years of industry experience, and that his experience was significant to the Board members when they made their salary decision.[14]

_____

Once the affirmative defenses are at issue, the focus of the inquiry shifts away from the existence of the pay differential (the prima facie case) toward seeking an explanation for why that pay differential has occurred. The dissent is simply incorrect in stating that the plaintiff's evidence underlying the prima facie case is necessarily sufficient to satisfy the plaintiff's burden of production, see Strag , 55 F.3d at 948 (stating that when the defendant brings forth sufficient evidence of its affirmative defense under the Equal Pay Act, the plaintiff must rebut the evidence in order to prevail), and create a genuine issue of material fact sufficient to preclude summary judgment in the defendant's favor on its affirmative defense. In some circumstances, the evidence underlying the prima facie case may still be relevant, but the pay differential at the heart of the prima facie case is already acknowledged in the structure of the affirmative defenses. Thus, evidence that merely points to the existence of a pay differential does nothing to further the plaintiff's cause. To survive summary judgment, the plaintiff must produce evidence, direct or circumstantial, that controverts the defendant's evidence that a legitimate ground justifies the pay difference.

[14] Although the dissent recognizes that experience and salary history can be proper bases for a salary differential, it suggests that we should

24

Brinkley has produced only the slimmest shreds of evidence from which it might be possible to infer that sex played a factor in the salary differential between her and Paschal. Her version of events, which is not supported by any concrete proof, is simply not enough to controvert the large quantity of undisputed material that HRC put into the record below in support of its affirmative defense. Brinkley has not raised a genuine issue of material fact that she was paid less because of her sex. Therefore, we affirm the district court's grant of summary judgment on Brinkley's Equal Pay Act claim.

V.

Based upon the foregoing discussion, we conclude that the district court's grant of summary judgment to HRC on both Brinkley's Title VII and Equal Pay Act claims were correct.

AFFIRMED

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

Respectfully, I dissent. Elizabeth Brinkley did not receive what the Equal Pay Act promises -- equal wages for equal work.

I.

In January, 1995, the Harbor Recreation Club (HRC) chose Brinkley to be its General Manager and agreed to pay her $50,000 annually.

_____

superimpose a "job-relatedness requirement" upon the factor-other-than-sex defense. Post at 30. This Court has not previously adopted this approach and neither the parties nor the district court have suggested it. Further, there is disagreement among our sister circuits on this issue. See Randolph Cent. Sch. Dist. v. Aldrich, 506 U.S. 965 (1992) (White, J., with whom Rehnquist, C.J. and O'Connor, J. joined, dissenting from denial of certiorari). We decline to consider this question without the benefit of briefing and argument. See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1227 (4th Cir. 1998) (declining to review issues not raised in the district court); Cavallo v. Star Enter., 100 F.3d 1150, 1152, n.2 (4th Cir. 1996) (holding that arguments not raised on appeal by appellants until their reply brief were not properly before the appellate court regardless of whether question was raised in district court).

25

In the eighteen months that she served in this position, HRC never raised Brinkley's salary. Then, dissatisfied with Brinkley's performance, HRC hired James Paschal to take over the management of the club, and agreed to pay him first $1,200 a week, or $62,400 per year, and ultimately $75,400 annually. The club subsequently fired Brinkley. HRC concedes that Brinkley and Paschal performed the same duties under the same working conditions and there can be no dispute that Brinkley received lower pay than Paschal for performing these duties. Thus, Brinkley unquestionably has made out a prima facie case under the Equal Pay Act (EPA), 29 U.S.C.A.§ 206(d)(1)(West 1998). See Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974).

"Once a plaintiff presents a prima facie case, the defendant has the burden of showing, by a preponderance of the evidence, that the pay differential was based on one of the four statutory exceptions." Keziah v. W. M. Brown & Son, Inc., 888 F.2d 322, 325 (4th Cir. 1989) (emphasis added). The majority ignores the requirement that these statutory exceptions, including the final catchall exception -- that the pay differential is based on a factor other than sex-- "must be narrowly construed" as well as the frequent admonition that an employer's burden in demonstrating that it is entitled to one of the statutory defenses is a "heavy" one. Id.; see also Timmer v. Michigan Dep't of Commerce, 104 F.3d 833, 843, 844 (6th Cir. 1997). Although the majority does acknowledge that, with respect to the affirmative defenses, the employer must meet both the burden of production and of persuasion, see Corning Glass, 417 U.S. at 196; 29 U.S.C.A. § 206(d)(1); see also Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 344 (4th Cir. 1994), it refuses to hold HRC to this burden.

Instead the majority improperly shifts the burden of proof to Brinkley by distorting applicable summary judgment principles. It does so by focusing almost exclusively on the movant's initial burden, misconstruing that burden in this Equal Pay Act case, and then virtually ignoring the crux of the summary judgment inquiry: whether, viewing all of the evidence in the light most favorable to the non-movant, there exists a material issue for trial. See Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

The majority asserts that a "defendant may prevail on its motion for summary judgment and establish an affirmative defense when it

26

has produced `credible evidence . . . that would entitle it to a directed verdict if not controverted at trial.'" Ante at 20 (emphasis added) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)). While technically accurate, i.e., a defendant with such evidence may ultimately prevail, this statement improperly suggests that a court may award summary judgment on the basis of the movant's evidence alone. In fact, a court considers whether a movant's evidence taken alone could support a directed verdict only to determine if a movant who has the burden of persuasion at trial has established its initial burden on summary judgment. See Celotex, 477 U.S. at 331 (Brennan, J., dissenting). If the movant passes this initial hurdle, only the burden of production shifts to the non-movant. Id. The ultimate burden of persuading the court of "the nonexistence of a `genuine issue' [remains] on the party moving for summary judgment." Id. at 330; see also Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993).

Although it concentrates its attention on the initial summary judgment burden, the majority fails to recognize the full scope of that burden in the context of this case. A prima facie case under the Equal Pay Act creates a presumption of discrimination, see Brinkley-Obu, 36 F.3d at 344,* and thus the defendant's evidence supporting an affirmative defense under the Act is never truly uncontroverted. Accordingly, an Equal Pay Act defendant must do more than merely produce evidence of its affirmative defense; it must overcome the presumption of discrimination and the evidence giving rise to it.

The majority's remaining summary judgment analysis is likewise seriously flawed. In fact, in holding that HRC is entitled to summary

_____

*The majority's suggestion that I err in "characterizing the prima facie case as `creat[ing] a presumption of discrimination,'" ante at 23 n.13, ignores recent circuit precedent that so holds. See Brinkley-Obu 36 F.3d at 344 ("Under the Equal Pay Act, the plaintiff creates a presumption of discrimination when she establishes a prima facie case."). The majority's refusal to follow this precedent is as ill-advised as it is improper. In this Circuit "a panel considers itself bound by the prior decision of another panel, absent an in banc overruling or a superseding contrary decision of the Supreme Court." Busby v. Crown Supply, Inc., 896 F.2d 833, 840-41 (4th Cir. 1990).

27

judgment because Brinkley "has not produced any evidence that indicates that Paschal was paid more, or that she was paid less, because of sex," ante at 22-23, the majority misconstrues the burden of proof under both the Equal Pay Act and the summary judgment rule. Neither require Brinkley, as the majority does, see id., to produce evidence that the salary differential was based on sex. Rather, in making out a prima facie case under the Equal Pay Act, Brinkley created a presumption of discrimination based on sex. See Brinkley-Obu, 36 F.3d at 344. To overcome that presumption, HRC as her "employer must prove that sex provide[d] no part of the basis for the wage differential." Timmer, 104 F.3d at 844 (emphasis added) (internal quotations and citations omitted). Brinkley, by contrast, merely needs to point to "specific facts showing there is a genuine issue for trial" in order to respond to the defendant's initial summary judgment showing. White v. Rockingham Radiologists, Ltd., 820 F.2d 98, 101 (4th Cir. 1987). Indeed, to meet her burden of production, Brinkley need only "come forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718-19 (4th Cir. 1991); see also, Celotex, 477 U.S. at 331 (Brennan, J., dissenting). This she unquestionably did. See infra at 30-32.

The ultimate burden of persuasion on summary judgment indisputably rests with the movant, and thus it was HRC's burden to demonstrate its entitlement to judgment as a matter of law based on the record as a whole. See Celotex, 477 U.S. at 330 & n.2 (in determining whether moving party has met its burdens and is entitled to summary judgment, "the court is obligated to take account of the entire setting of the case and must consider all papers of record as well as any materials prepared for the motion") (Brennan, J., dissenting); see also 10A Charles Alan Wright et al., Federal Practice and Procedure § 2727, at 476, 480 (3d ed. 1998). Accordingly, HRC had to demonstrate that no reasonable factfinder faced with all of the evidence forecast by HRC and by Brinkley could conclude that Brinkley was paid less than Paschal because of her sex.

Instead of requiring HRC to carry this burden, the majority effectively bases its affirmance of summary judgment to HRC solely on its conclusion that HRC carried its initial summary judgment burden; the majority stalwartly refuses to consider carefully either the presumption of discrimination created by Brinkley's prima facie case or her

28

evidence of numerous material factual disputes. The majority thus denies Brinkley that to which all parties opposing summary judgment are entitled, i.e., the court's construction of the "facts and inferences in the light most favorable" to them. United States v. Leak, 123 F.3d 787, 794 (4th Cir. 1997) (quoting Donmar Enter., Inc. v. Southern Nat'l Bank of N.C., 64 F.3d 944, 946 (4th Cir. 1995)). See also 10A Wright et al, supra § 2727, at 459 ("Because the burden is on the movant, the evidence presented to the court always is construed in favor of the party opposing the motion and the opponent is given the benefit of all favorable inferences that can be drawn from it.") (emphasis added) (citing numerous cases, including Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986)).

In sum, the majority is only able to affirm here by holding that Brinkley failed to carry a burden of production that she never had, and by exempting HRC from a burden of persuasion that it should have been required to carry. If the majority had held HRC to its heavy burden of proof rather than improperly shifting this burden to Brinkley, and if the majority had evaluated the evidence in the summary judgment record in the light most favorable to Brinkley as the non-moving party, it could only have reversed the grant of summary judgment to HRC.

II.

The majority also seriously errs in its analysis of the reasons proffered by HRC for payment of a greater salary to a man than it had paid to a woman for the same work.

First, notwithstanding the majority's suggestion, HRC's decision to pay Brinkley less than Paschal for the same work cannot be justified simply because the market would bear this result. As the Supreme Court has explained, while it may be "understandable as a matter of economics" that a company wishes to take advantage of a market in which it can pay a woman less than a man for the same work, such "differential[s] nevertheless became illegal once Congress enacted into law the principle of equal pay for equal work." Corning Glass, 417 U.S. at 205. For this reason, we and many of our sister circuits have expressly held that the fact that a woman has less bargaining power to demand a higher salary than a man does not constitute a

29

valid factor "other than sex" under the Equal Pay Act. See, e.g., Brock v. Georgia Southwestern College, 765 F.2d 1026, 1037 (11th Cir. 1985); Horner v. Mary Inst., 613 F.2d 706, 714 (8th Cir. 1980); Brennan v. Prince William Hosp. Corp., 503 F.2d 282, 286 (4th Cir. 1974); Brennan v. Victoria Bank & Trust Co., 493 F.2d 896, 902 (5th Cir. 1974); Brennan v. City Stores, Inc., 479 F.2d 235, 241 n.12 (5th Cir. 1973); Hodgson v. Brookhaven Gen. Hosp., 436 F.2d 719, 726 (5th Cir. 1970).

Second, contrary to the majority's statement that "the record reflects that the Board followed the same procedures when it evaluated Brinkley's initial salary" as when it evaluated Paschal's, ante at 22, the record reveals nothing of the kind. Rather, the record evidence is that HRC totally failed to research comparable club salaries when it hired Brinkley. Moreover, its failure to investigate an appropriate salary for Brinkley provides no justification for its payment of a far greater salary to Paschal for the same work. In Brewster v. Barnes, 788 F.2d 985 (4th Cir. 1986), we rejected this excuse and concluded that the employer had not met its burden of proving its affirmative defense when it had failed to investigate whether the plaintiff was eligible for a pay-raise. Id. at 992. Thus, the fact that HRC researched the proper salary range in order to pay Paschal the "going rate" for country club managers cannot justify its payment to Brinkley of considerably less money for the same work.

This leaves Paschal's asserted better experience and salary history, which allegedly indicated that he was a more valuable employee than Brinkley, as the only bases other than sex for paying Paschal more than Brinkley. Experience and salary history differentials may, in the proper case, constitute bases upon which to pay a man more than a woman for the same work. However, only if an employer has proffered some valid business reason for believing that these factors justify paying a man more than a woman (or a woman more than a man) should the employer be permitted to rely on such rationales because "[w]ithout a job-relatedness requirement, the factor-other-than-sex defense would provide a gaping loophole in the statute through which many pretexts for discrimination would be sanctioned." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 525 (2d Cir. 1992); see also EEOC v. J.C. Penney Co., Inc., 843 F.2d 249, 253 (6th Cir. 1987); Bence v. Detroit Health Corp., 712 F.2d 1024, 1030-31 (6th Cir.

30

1983). HRC, of course, provided no such evidence. But even if HRC were not held to this business-relatedness requirement, the record unquestionably reveals a genuine dispute as to whether Paschal's experience was actually "better" than Brinkley's and whether his salary history actually did demonstrate that he was "worth more" to HRC than Brinkley.

With regard to the varying past experience between Paschal and Brinkley, Paschal submitted a resume listing eleven years of experience working in country clubs, but he had no college degree, no formal business education, and no professional certification. At the time HRC made Brinkley its General Manager, her only previous country club experience was her two years as Business Manager with HRC; however, in that position she had been responsible, in HRC's words, for "many of the duties usually assumed by a General Manager" and had performed them so well that HRC promoted her to General Manager. Moreover, prior to being hired by HRC, Brinkley had earned a college degree, majoring in business administration, completed some credits toward a graduate degree, and, after taking additional courses and passing an examination, had been certified as a Credit Executive. Brinkley also had twenty years of general business experience, including twelve years as owner and operator of a restaurant. Brinkley's longer experience in the business world and far more extensive business training resulted in concrete benefits for HRC -- for example, she could operate HRC's computer system and understood its accounting programs; Paschal could do neither.

A jury could conclude that Paschal's greater country club experience justified HRC's paying him substantially more than it paid Brinkley even though, when the club hired him, Paschal was an unknown quantity while Brinkley had intimate knowledge of HRC, greater general business experience, and far superior business training. But a reasonable jury could as easily reach the opposite conclusion; it could conclude that Paschal's experience was not superior to Brinkley's and so could not serve as a basis other than sex upon which to justify the pay differential. Such a conclusion would be entirely supported by the record, particularly in light of Paschal's admission that he had been fired from or forced to leave earlier positions, evidence that certainly raises a dispute as to the quality of his experience. In the end it is up to the jury to decide if Brinkley's busi-

31

ness experience is enough to "overcome" Paschal's longer tenure in the field. See ante at 24.

As for salary history, Paschal maintained that he held jobs ranging in salary from $65,000 to $85,000 before coming to HRC, while Brinkley's highest salary prior to being appointed General Manager of the club paid only $30,000. However, Paschal admitted in deposition that he had been fired from one previous country club position and forced to retire from another. Furthermore, HRC failed to contact Paschal's last employer in order to determine if he was valued at such a high salary, an omission that even an HRC board member categorized as "careless."

A reasonable jury could conclude that Paschal's higher salary did signal that he was a more valuable employee. But a jury certainly could just as reasonably conclude that Paschal's checkered job history demonstrated that his "worth" in the job market did not exceed (or even equal) Brinkley's and that HRC failed to prove by a preponderance of the evidence that it paid Paschal more than Brinkley based on a factor other than sex.

Keziah constitutes clear circuit precedent with facts stunningly close to those at hand. See 888 F.2d 322. There, as here, the employer paid a man a higher salary for performing "the exact same job" as the female plaintiff. Id. at 324. There, as here, the district court granted summary judgment to the employer on the plaintiff's Equal Pay Act claim, finding the salary differential justified by the man's "experience and customer base" despite the fact that the female plaintiff offered evidence of her own prior experience, which, while different, "[a]rguably . . . was as related to her position" as her comparator's experience. Id. at 325. There, as here, "objective evidence in the record" cast doubt on the comparator's experience. Id. In Keziah, we reversed the grant of summary judgment to the employer, explaining that the "record, when reviewed as a whole, demonstrates the company's failure to prove that the salary differential resulted from `any factor other than sex'" and remanded due to the genuine dispute as to whether the male comparator's experience was really better than the female plaintiff's so as to justify a higher wage. Id. (emphasis added).

Similarly, in Fowler v. Land Management Groupe, Inc., 978 F.2d 158 (4th Cir. 1992), we reversed the district court's grant of judgment

32

for the employer on the plaintiff's Equal Pay Act claim. In Fowler, as here, the employer conceded that the plaintiff presented ample evidence for a jury to find that plaintiff made out a prima facie case under the Act. Id. at 161. However, the employer in Fowler contended, as HRC does, that its evidence justifying the pay differential on a basis other than sex -- including the comparator's greater professional qualifications and licenses, greater and more relevant practical experience in the field, higher profit-making potential, and a general impression that he was a "more important" employee -- was so overwhelming that no reasonable jury could have found for plaintiff. Id. Although the district court agreed and granted judgment for the employer after a jury verdict for the plaintiff, we reversed. We noted that although the employer's evidence was persuasive, evidence in the record -- including evidence of the plaintiff's higher level of formal education -- served to counter the employer's proffered reasons for paying the comparator more than the plaintiff. Id. Thus again in Fowler, as here, evidence in the record placed the employer's justification into doubt; as such "the question of whether the pay differential between [comparator] and [plaintiff] was adequately justified by nondiscriminatory factors was appropriately a matter for determination by the jury." Id. at 162.

Keziah and Fowler require reversal here. The record in this case, as in Keziah and Fowler, unquestionably reveals a material dispute as to whether a factor other than sex served as the basis for paying Paschal far more than Brinkley. By calling into doubt HRC's evidence, Brinkley clearly did more than "merely point[ ] to the existence of a pay differential," ante at 24 n.13, she "produce[d] evidence, direct or circumstantial, that controverts the defendant's evidence that a legitimate ground justifies the pay difference," id., and placed the issue squarely in dispute. Judgment as a matter of law for the employer is therefore as improper in this case as it was in Keziah and Fowler. The majority's relegation of Keziah and Fowler to a footnote and its failure to offer any meaningful distinction of them speaks volumes.

III.

The Supreme Court explained twenty-five years ago that Congress enacted the Equal Pay Act to remedy a "serious and endemic problem" -- the fact that the wage structure of "many segments of Ameri-

33

can industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same." Corning Glass, 417 U.S. at 195 (internal quotation marks omitted). Today, in depriving Brinkley of a trial on her Equal Pay Act claim, the majority frustrates Congress's clear purpose in enacting this legislation. I regret the majority's ill-advised action and dissent from it.

34