**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1882**

DEAN M. INMAN,

                    Plaintiff - Appellant,

          v.

KLOCKNER PENTAPLAST OF AMERICA, INCORPORATED; KLOCKNER
PENTAPLAST PARTICIPATIONS,

                    Defendants – Appellees,

          and

KLOCKNER PENTAPLAST GROUP,

                    Defendant.

-------------------------------------------

AARP,

                    Amicus Supporting Appellant.


Appeal from the United States District Court for the Western
District of Virginia, at Charlottesville.  Norman K. Moon,
District Judge.  (3:06-cv-00011-nkm-bwe)


Argued: September 24, 2009        Decided: October 22, 2009


Before TRAXLER, Chief Judge, HAMILTON, Senior Circuit Judge, and
Mark S. DAVIS, United States District Judge for the Eastern
District of Virginia, sitting by designation.

Reversed and remanded by unpublished per curiam opinion.

---

**ARGUED:** Adam Augustine Carter, EMPLOYMENT LAW GROUP, PC, Washington, D.C., for Appellant. Melvin Earl Gibson, Jr., TREMBLAY & SMITH, Charlottesville, Virginia, for Appellees. **ON BRIEF:** R. Scott Oswald, EMPLOYMENT LAW GROUP, PC, Washington, D.C., for Appellant. Thomas E. Albro, Patricia D. McGraw, TREMBLAY & SMITH, Charlottesville, Virginia, for Appellees. Laurie A. McCann, Daniel B. Kohrman, AARP FOUNDATION LITIGATION, Melvin Radowitz, AARP, Washington, D.C., for Amicus Supporting Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Dean Inman appeals the grant of summary judgment against him on his claim of discrimination under the Age Discrimination in Employment Act, see 29 U.S.C.A. § 623(a)(1) (West 2008), and his request for declaratory judgment, both of which arise from his assertion that he was improperly terminated. We reverse the grant of summary judgment and remand for further proceedings.

I.

Klöckner Pentaplast of America, Inc. ("KPA") is one of the world's leading producers of films for pharmaceuticals, medical devices, food, electronics, and general purpose thermoform packaging, as well as printing and specialty applications. In 2001, Cinven Company and J.P Morgan bought KPA for more than $800 million, planning to cuts costs, increase profits, and re-sell the company in four or five years. In 2007, they sold KPA to a private equity firm for approximately $1.8 billion.

When he was fired by KPA in December 2005, Inman was 58 years old and was serving as Vice President of Technology. Inman had worked for KPA for 17 years, starting in 1988 as a manager in training before eventually becoming head of KPA's technical department. Inman was also a member of KPA's "Steering Team," an executive committee comprised of KPA senior leadership that managed the company.

In 2003, Michael Tubridy became President of KPA's North and South American Operations after having served unofficially in that capacity for a few months. Although Tubridy always appreciated Inman's technical skills, he did not think much of his leadership style. In conducting a performance review of Inman in December 2003, Tubridy expressed concern with Inman's group and team leadership abilities. He described Inman's allocation of staff responsibilities as "dysfunctional" and stated that there was room for improvement in the areas of personnel development and succession planning. J.A. 674. Tubridy explained that he wanted Inman to create a commercial development plan for his department, a plan which would set goals and metrics that would allow the department's actual performance to be measured against the goals.

Inman resisted these requests, however, believing they were not necessary in light of certain historical information kept on the technical department's computer system. In early 2004, after Mike Yeatts, director of KPA's human resources department, emailed Inman a draft of the plan Tubridy sought, Inman informed Yeatts that he rejected the plan "in its entirety." J.A. 613. Inman explained in his deposition that the proposal was "very minimal in value, very sophomoric in its content, nothing of value" and that Inman "did not understand why someone without the training, apparent training in such issues would be

4

attempting to provide the information." J.A. 679. Tubridy raised this request again during Inman's 2004 performance review, this time even sketching out the form that he wanted the plan to take. Inman still never developed the plan, however, and by August 2005, Tubridy had concluded that Inman never would.

Although Tubridy was frustrated with Inman's refusal to develop a plan to set measurable goals for his department, it was a culmination of events over the course of several months in 2005 that Tubridy claims led to his decision to terminate Inman. First, Inman balked at signing a non-compete agreement and attempted to renegotiate some of its terms. Tubridy apparently found that response unprofessional, particularly since Inman was at the same time requiring each of the employees in his department to sign the agreement. Then Inman objected to attending a mandatory training session on how to conduct employment interviews, sending sarcastic emails about the subject to the human resources department.

In September 2005, Tubridy decided that because of the company's financial condition (which had worsened after Hurricanes Katrina and Rita disrupted their supplies and greatly increased their costs), KPA needed to implement a wage freeze. Tubridy presented that idea to the Steering Team on the afternoon of September 14, 2005, before a scheduled dinner

5

meeting for KPA supervisors. The Steering Team members present unanimously agreed to the freeze, but Inman was not present then--he was on his way to the dinner meeting from a KPA site in West Virginia. Tubridy says he pulled Inman aside during pre-dinner cocktails and told him about the salary freeze, and he formally announced the freeze during dinner later that night. The next day, another member of the Steering Team told Tubridy that he had heard that Inman was complaining about the salary freeze. Tubridy claims that he brought Inman in for a meeting, to give Inman a chance to talk about the salary freeze again, since the idea had been sprung on him the night before with little notice. Tubridy testified that Inman told him that he understood why the freeze was necessary and that he supported the company's decision. Tubridy testified that he then told Inman that he had heard that Inman had complained about the decision and that Inman's immediate response was, "I guess I need to be careful what I share with Charlie Abbey." J.A. 742. Tubridy claims he understood that to be a confession of sorts and therefore that Inman had just lied to him when he had said he understood and supported the freeze.

Inman's version of events is different. He maintains that Tubridy did not tell him about the freeze ahead of time, and that he learned about it when everyone else did, when Tubridy announced it at the dinner. Inman says that the day after the

6

announcement, he was in Charlie Abbey's office and listened to Abbey complain about the freeze, but Inman did not himself express disappointment concerning the freeze. As to the meeting with Tubridy, Inman claims that Tubridy said he had heard that Inman had some concerns about the freeze, and Inman told him that he did have questions. Inman said he mentioned Abbey only because Abbey was "known as a gossip within the company, he's known to . . . tell whoppers, to sensationalize stories." J.A. 883. Inman insists that he never complained about the salary freeze to anyone in the company.

According to Tubridy, the salary-freeze issue was the last straw for him. He believed that as a member of the Steering Team, Inman should support the decisions made by the team, and he also believed that Inman had lied to him about supporting the freeze. Tubridy claims he lost confidence in Inman at that point, and essentially decided then that Inman had to be fired.

A couple of other events occurred after the salary-freeze meeting that Tubridy contends reinforced his belief that Inman needed to be replaced. Sometime before the fall of 2005, the Steering Team decided to reduce costs by changing health insurance providers. The new policy went into effect in October 2005, and as it turned out, led to an increase in the co-payment for a medicine Inman was taking. This angered Inman greatly, and he sent an email to a staffer in the human resources

7

department stating that he would hold KPA "responsible for any and all harm that is done to my health and/or any increase in my out of pocket expenses as a result of our new insurance company playing the role of dictating which medications I should and should not use." J.A. 618. Additionally, in response to inquiries from the human resources department about participation in a retirement program, Inman sent emails to another human resources staffer complaining that he could not afford to participate in light of the wage freeze and denigrating the company's decision to implement the freeze. Mike Yeatts, KPA's human resources director, told Tubridy about these emails, and Tubridy told Yeatts to inform Inman that such behavior would not be tolerated.

On December 15, 2005, Tubridy called Inman into his office and fired him. Inman claims that in that meeting, Tubridy said that Inman "did not fit the 'profile' or 'model' of what is needed in a technical leader in terms of KPA's presentation to potential buyers of the company." J.A. 824. Inman claims that Tubridy said that KPA needed a "more energetic person" as leader of the technical department, "for the appearance of a revitalized company." J.A. 824. Tubridy told Inman "that he wanted KPA work to be more oriented around financial results and budgets tied to compensation, rather than the 'same old things' that [Inman] had provided." J.A. 824. Inman was replaced by

8

45-year-old David Veasey, who had been Vice-President of Operations. When Veasey took over, KPA changed the position somewhat, eliminating some of what had been Inman's responsibilities.

In 2003, Inman had been one of a small group of executives permitted to buy KPA stock, and the expectation was that the stock would become very valuable once the company was sold. Inman paid $32,700 when he bought the stock in 2003. After he was fired, KPA tendered a check for $41,000 to buy back the stock, in accordance with the terms of the program under which Inman bought the stock. Inman has never cashed the check, claiming that he was wrongfully terminated and that he is entitled to keep the stock, which, since the KPA sale, is worth substantially more than the $41,000 that KPA tendered.

Inman eventually filed this action against KPA,[1] asserting various claims under state and federal law, including a claim of age discrimination. Inman also sought a declaration that he was entitled to keep the stock. The district court granted KPA's motion to dismiss several of the claims. The court later granted summary judgment against Inman's age-discrimination

---

[1] Inman also named as a defendant Klöckner Pentaplast Participations, a Luxembourgian entity formed to allow certain of KPA's managers and officers to acquire an ownership interest in KPA's parent company, Klöckner Pentaplast Group.

claim.  Finding no other basis for Inman's wrongful termination claim, the district court also granted summary judgment in KPA's favor on Inman's request for a declaratory judgment that he was entitled to retain the stock.

II.

On appeal, Inman contends that the district court erred in granting summary judgment against him in light of the evidence he presented.  We agree.[2]

We review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmovant, Inman. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 283 (4th Cir. 2004) (en banc).  To make a prima facie showing of age discrimination under the pretext framework, a plaintiff-employee must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was at the relevant time performing his duties at a level that met his employer's legitimate expectations; and (4) his position remained open or was filled by someone substantially younger.

---

[2] Inman also raises a procedural claim, arguing that the district court improperly looked to KPA's evidence on an issue that the magistrate judge had refused to let Inman pursue during discovery, and that this error warrants reversal.  Because of our disposition of Inman's substantive argument, we do not address this procedural claim.

See id. at 285. If the plaintiff makes that showing, it is incumbent on the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. See id. To avoid summary judgment, the plaintiff must present evidence showing that the employer's stated reasons were not its true reasons, but were a pretext for discrimination. See id.

There is no question that Inman is a member of a protected class, that he suffered an adverse employment action, and that he was replaced by someone substantially younger. The critical questions before us are whether Inman's evidence showed that he was meeting KPA's legitimate expectations and whether Inman has established that KPA's proffered reasons for his termination were pretextual.

KPA argues that Inman's claim fails at the legitimate-expectation step. KPA argues that because Inman refused to develop the performance metrics Tubridy wanted for the technical department, refused to support the salary freeze (and lied to Tubridy about it), and belittled and harassed the human resources staff, there was no genuine issue of material fact regarding whether Inman was meeting KPA's legitimate expectations. We are not persuaded.

First, some evidence tends to show that Inman was adequately performing--he received bonuses every year, and he was singled out for praise by Tubridy at a company gathering

11

just a couple of weeks before he was fired. Moreover, if Inman has evidence from which a jury could conclude that the real reason he was fired was his age, the jury could also conclude that the deficiencies that KPA claimed existed in Inman's work were exaggerated to cover up the age-based motivation for the termination and that any such deficiencies were not sufficient to prevent his performance from being adequate.

We conclude that Inman has in fact presented sufficient evidence that KPA's proffered reasons for terminating Inman were mere pretext. First, the summary judgment record contains evidence that if accepted by the jury would contradict KPA's position about the salary-freeze issue--the issue that KPA maintains was the main reason that Inman was fired. According to Inman, Tubridy did <u>not</u> tell him about the salary freeze before it was announced, and when Tubridy asked him the next day if he had concerns about the salary freeze, Inman said that he did. This is directly contrary to Tubridy's claim that Inman told him he supported the wage freeze, and would completely undercut the claim that Tubridy wanted to fire Inman because he lied about supporting the wage freeze.

Other evidence supports the conclusion that Inman's age was the actual reason for his termination. First, there are the statements that Inman says Tubridy made when he fired him--that Inman did not fit the "model" or "profile" of the "energetic"

12

person needed to project KPA as the "revitalized" company that KPA wanted to present to potential buyers. J.A. 824. There was also evidence concerning KPA's dealings with Proudfoot Consulting. In October 2005, just a few months before Inman was fired, KPA hired Proudfoot to review its operations and help devise a plan to increase its efficiency and reduce its operating expenses. Tubridy and Veasey (who ultimately replaced Inman, but then was Vice President of Operations) met with Andreas Paetz of Proudfoot on October 27, 2005, to talk about the project. Paetz wanted four KPA employees to be assigned to a task force that would conduct this review and said that they should be "young," "energetic," "future people." J.A. 970. Tubridy made notes on a napkin during the Proudfoot meeting. Tubridy's napkin-notes included the phrase "young, energ[etic]." J.A. 976. Veasey had a follow-up meeting with Paetz the next day, and Veasey's handwritten notes from that meeting stated "KPA team – young – energetic, future people." J.A. 970.

KPA insists that these notations are meaningless because Tubridy and Veasey were merely writing down what Paetz said, and Paetz was not a decisionmaker with regard to Inman's employment. See, e.g., Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated, and unless the remarks upon which plaintiff relies were related to the

13

employment decision in question, they cannot be evidence of discrimination." (internal quotation marks and alteration omitted)), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). KPA also notes that Paetz, who is German, explained in his deposition that when he said "young," he meant employees who were "young" with the company—who had not worked for KPA long enough to develop political alliances, etc. We conclude, however, that these arguments miss the mark.

First of all, even though Paetz was not a decisionmaker, Tubridy was, and he found Paetz's reference to "young" employees sufficiently significant to write it down. Moreover, Paetz's explanation of what he meant by "young" is not as clear as KPA claims. While Paetz did say that "young" referred to length of employment, at another point in his testimony, he also seemed to say that it meant chronological age. In any event, given the usual understanding of the word "young," it is for a jury to decide what Paetz meant, and, more importantly, what Tubridy understood the reference to mean when he wrote it down and whether Tubridy adopted the goal of having "young, energetic" workers as his own.[3]

---

[3] KPA emphasizes that the selection of the task force is not the adverse employment action of which Inman complains. While that is true, the evidence in question still tends to show that Tubridy was thinking about the need for youth in the company in the weeks before the alleged age discrimination occurred.

14

## III.

In sum, we hold that the district court erred by granting summary judgment against Inman on his age discrimination claim and therefore also on his request for declaratory relief. Accordingly, we vacate the judgment against Inman and remand to the district court for further proceedings.

<u>REVERSED AND REMANDED</u>